# DECISIONS

OF THE

# SUPREME JUDICIAL COURT

OF

# MASSACHUSETTS

---

AGOOS KID CO., INC. *vs.* BLUMENTHAL IMPORT
CORPORATION.

Suffolk. May 17, 1932, January 9, 1933. — February 13, 1933.

Present: RUGG, C.J., CROSBY, FIELD, & DONAHUE, JJ.

*Sale*, Warranty. *Contract*, Construction. *Sales Act. Custom. Evidence*, Of custom, Competency.

A judge, who heard a suit in equity in which the plaintiff, a manufacturer of leather, sought damages for breach of an alleged implied warranty of merchantability of goat skins sold by the defendant, found, upon evidence warranting the finding, that the contract of sale called for "Bagdad Goatskins Drysalted"; that the skins were to be paid for by the plaintiff "Net Cash or Domestic letter of credit against documents"; that in the trade it was considered that a lot of the skins was normal if it did not appear that more than one and one half per cent, or at the most three per cent, were improperly cured and therefore worthless; that there was no inspection of the goods before they were put into manufacture; that inspection would have been impracticable because the price was to be paid upon delivery of the documents, before delivery of the goods, and also because inspection would not have revealed latent defects which finally were discovered in the process of manufacture and which rendered one half of the goods unmerchantable; that the goods were sold by description, and not by any "patent or other trade name"; and that the defendant was liable to the plaintiff for damages caused by breach of implied warranty of merchantability. *Held*, that

(1) The contract was for a sale of goods by description and there was an implied warranty that they would correspond with the description under § 16, and would be of merchantable quality under § 17 (2) of G. L. c. 106;

(2) As the goods were not sold under a patent or trade name, cl. 4 of § 17 of the statute had no application.

A provision of the contract of sale above described, "Sellers have no responsibility whatsoever for the outturn of goods in manufacture," meant that the risks and results of the manufacturing process must be assumed by the buyer, but only after delivery to him of such goods as were described in the contract, and in the circumstances did not absolve the defendant from liability, it appearing that the goods delivered were not such as the contract described.

The judge who heard the suit above described, upon evidence and by warrantable inferences found that the plaintiff "made known to the defendant that the goat skins were required for the particular purpose of making them into leather, and that the plaintiff relied upon the defendant's skill and judgment," and he ruled "that nothing in the contracts or correspondence between the parties" prevented "the plaintiff from relying upon these implied warranties"; and he assessed additional damages under G. L. c. 106, § 17 (1). *Held*, that such findings and rulings were warranted.

A further provision of the contract of sale was as follows: "All claims must be made in writing within one week after receipt of the goods. Ten per cent of original packages may be opened for inspection purposes, but otherwise held intact. If buyer fails to present his claim within the specified time or if more than 10% of original packages have been opened, seller is entitled to refuse arbitration. . . ." There were further detailed provisions as to arbitration. *Held*, that, although no claim was made by the plaintiff until over a month following the receipt of the goods, and although he used more than ten per cent of them, such provisions of the contract, correctly construed, did not bar the plaintiff from recovery, they being limited to giving the seller the right to refuse arbitration.

Findings by the judge in the suit above described in substance were that the defects in the skins in question could not be discovered on inspection before manufacture; that, while defects to some extent were discovered as various lots were put through different processes in manufacture, a sufficient number of defects to make certain that the whole lot would fall materially below the requirements of the implied warranty of merchantability were not discovered until over a month after receipt of the goods; and that the defendant then was given notice by the plaintiff. The judge concluded that such notice was given within a reasonable time after the plaintiff knew or ought to have known of such defect. The contract was in writing and contained the provisions: "All claims must be made in writing within one week after receipt of the goods. Ten per cent of original packages may be opened for inspection purposes, but otherwise held intact." Statements printed on the defendant's bill heads read, "All claims must be made before goods are put into works," and

"No claims allowed later than 7 days after receipt of goods." *Held*, that

(1) The conclusion by the judge was warranted;

(2) The provisions of the contract did not preclude recovery by the plaintiff;

(3) The statements printed on the defendant's bill heads were no part of the contract between the parties, and were immaterial.

It appearing that the provision for arbitration above described was waived by both parties, it was proper for the trial judge to rule that, as neither party proposed or refused arbitration in fact, the provision for arbitration became immaterial.

The plaintiff in the suit above described sought damages for breach of implied warranty as to goods shipped under two contracts of sale, one made on September 9 and the other sixteen days later. It appeared that the skins arrived in two shipments, each containing a part of the goods purchased under each contract; that the first shipment arrived on the following January 3 and that manufacture of the first lot thereof began on January 14; that the second shipment arrived on January 19, while the first lot of the first shipment still was in process; that at the plaintiff's request the defendant granted an extension of time for payment for the second shipment provided the goods were placed in storage in the defendant's name; that, still later, and before defects in the goods in the first shipment to an extent to require notice by the plaintiff to the defendant were discovered, a further extension as to payment for the second shipment was given, the defendant insisting upon confirmation by the plaintiff that an inspection had been made, and the plaintiff on February 13 stating: "We have made a cursory examination of these goods on the dock and so far as we can see, they are in order. We presume that the balance of the lot are the same as the bales we examined on the dock, but should any difference arise after our examination of the goods at the tannery, we shall, of course, expect that you recognize anything that is not right with these goods . . ."; that on March 10 the plaintiff notified the defendant of the defects in the goods included in the first shipment, which, the judge found, extended to nearly one half of the skins. The judge further found "that the breach of warranty as to the first shipment was so material as to justify the plaintiff in refusing to proceed further and in suing for damages." There was no evidence, and no reason to suppose, that the second shipment was defective. The plaintiff refused to accept delivery of the second shipment, the defendant sold the goods included therein at a loss, and then sought to establish a counter claim therefor. Such claim was dismissed. *Held*, that

(1) Under G. L. c. 106, § 34 (2), upon the findings of the judge as to the first shipment, the breach of the contract was so material as to affect the contracts as a whole, and justified the plaintiff in refusing to proceed with the contracts and in suing for damages for breach of the entire contracts;

(2) The counter claim rightly was dismissed;

(3) Failure of the plaintiff to inspect the entire second shipment was

not important, since, although the plaintiff had an opportunity to inspect all the skins contained in the second shipment, such inspection would not have revealed the defects therein because such defects could not have been discovered until the skins had been put in process of manufacture into leather.

By reason of the provisions of G. L. c. 106, § 60, it was prejudicial error for the judge who heard the suit above described to exclude evidence, offered by the defendant, that, during the time to which the contracts in issue related, there was "a universal custom in the trade dealing in Bagdad goat skins, that any claim of inferior quality must be made before goods are put into works in order to entitle the claim to any recognition at the hands of the seller"; and, by reason of such error, a final decree for the plaintiff was reversed and the suit was remanded for further hearing in the trial court, all findings of fact previously made by the judge to stand, but the question to be determined, whether a custom of the character described existed and would bar recovery by the plaintiff on either contract.

In the special circumstances appearing in the suit above described, it was proper for the judge to assess under G. L. c. 106, § 58 (7), damages greater in amount than would have been awarded under cl. 6.

BILL IN EQUITY, filed in the Superior Court on May 28, 1931, and described in the opinion.

In the Superior Court, the suit was heard by *Lummus*, J. Material evidence, and findings and rulings and order by the trial judge for a final decree are described in the opinion. The final decree was entered by order of *F. T. Hammond*, J. The defendant appealed.

*J. N. Welch*, (*A. Brayton* with him,) for the defendant.

*Lee M. Friedman*, (*P. D. Turner* with him,) for the plaintiff.

*J. Garfield* & *J. Barker, Jr.*, by leave of court submitted a brief as *amici curiae* on behalf of National Association of Importers of Hides and Skins.

CROSBY, J.   This bill in equity, although brought to reach and apply, has become a claim for damages arising from the alleged breaches of two contracts in writing for the purchase and sale of certain goat skins. The case was heard by a judge of the Superior Court sitting without a jury. A brief has been filed by counsel representing the National Association of Importers of Hides and Skins as *amici curiae*.

The eighth and ninth paragraphs of the bill relate, re-

spectively, to two claims which, it is agreed by the parties, are owed to the plaintiff, one for the sum of $4,633.43 with interest from June 19, 1931, and the other for $500 with interest from March 26, 1931. The contracts are substantially identical in form. Under the first contract, dated September 9, 1930, the defendant agreed to sell and the plaintiff to buy four thousand dozen Bagdad goat skins dry-salted; and under the second contract dated September 25, 1930, to buy three thousand dozen of the same kind of skins. The skins arrived in two shipments, each containing a part of the goods purchased under each contract. The plaintiff received, paid for and used the entire first shipment, but refused to accept or pay for the second. The claim of the plaintiff is for breach of warranties as to the skins delivered under the first shipment, and it contends that it was lawfully entitled to refuse, receive or pay for the second shipment. The defendant claims damages for the plaintiff's failure to accept and pay for the second shipment. Both contracts involve the purchase and sale of "Bagdad Goatskins Drysalted" of various weights and at different prices, and provided that the skins were "to be of the good season." It was agreed that the skins were in fact "of the good season."

It is the contention of the plaintiff that there was a breach of warranty in two respects, (1) that the merchandise delivered by the first shipment was not merchantable as "Bagdad Goatskins Drysalted," and (2) that as the plaintiff made known to the defendant the particular purpose for which the skins were required (G. L. c. 106, § 17 [1]), and relied on the defendant's skill and judgment for the selection of the skins, those delivered were not reasonably fit for such purpose. It is by reason of these alleged breaches of contract that the plaintiff contends it was justified in not further proceeding to carry out the contracts, and the judge so found. The defendant contends that the plaintiff failed to notify it in writing within one week after the receipt of the goods of any claim, and for that reason any claim which the plaintiff might otherwise have is barred. Upon this issue the judge found

that the plaintiff gave notice to the defendant within a reasonable time after the plaintiff knew or ought to have known of such defect.   Both contracts provided that the skins were to be paid for by the plaintiff "Net Cash or Domestic letter of credit against documents."   The judge found that as to the first shipment "No inspection by the plaintiff was had before the goods were paid for.   The goods were then shipped by the plaintiff to its factory at Lynn, and on January 14, 1931, the plaintiff started the tanning and finishing of one pack of the skins amounting to eight hundred ten skins."   The entire evidence before the trial judge is contained in the record.

1. Upon the question whether there was an implied warranty of merchantable quality under G. L. c. 106, § 17 (2), the following facts were found: The goods described in the contracts known in the trade as "Bagdad Goatskins Drysalted" are a well known article of commerce.   The defendant maintains an organization in various places in Asia Minor and India for the purpose of collecting dry-salted skins for shipment to the United States, and at the time of the collection of the skins in question it had a representative in Bagdad.   At times such representatives buy from local collectors and butchers skins which have been cured by the dry-salting process.   This process is efficient in preserving the texture of the skins only when an attempt is not made to dry them too quickly by the hot rays of the sun, which is likely to result in a rotting of the inside of the skin, where it cannot be detected by ocular or manual inspection or in any other practicable way until the skins are put into the process of being made into leather.   With reasonable precaution in the care and selection of the skins in the Orient, a certain number of improperly cured and rotted skins is likely to be found in a large lot.   Both parties were aware of this fact.   In the trade it is considered that a lot is normal if it does not appear that more than one and one half per cent, or at the most three per cent, are improperly cured and therefore worthless.   "Certainly a lot containing more than three per cent of rotted skins is abnormal."   It was

found that so far as defects appeared the defendant was ignorant of their condition, and the same was true of the plaintiff until the defects were shown in the plaintiff's tannery. Beginning with the first pack of skins of the first shipment the plaintiff, on January 14, 1931, began the process of manufacturing them into leather, and at different times thereafter all the other packs were put through the process, and many of them showed that more than three per cent were rotten. The entire first shipment was finally put through the process, and it was found that "the defects in the first shipment were very material and important and extended to nearly half the skins contained in it." Upon the foregoing findings which were warranted by the evidence, the further finding was warranted that the goods delivered by the first shipment were not of merchantable quality.

The contracts in question were for a sale of goods by description and there was an implied warranty that they would correspond with the description. G. L. c. 106, § 16. The goods are merchantable when they are of the general kind which they are described or supposed to be when bought. Williston on Sales (2d ed.) § 243. "Where goods of a character commonly known in trade are ordered by description, and there is no inspection, there is an implied warranty that those furnished will be such as are merchantable under the descriptive term used by the parties. The purchaser is entitled to get what he ordered." *Leavitt* v. *Fiberloid Co.* 196 Mass. 440, 451, and cases cited. See also *Randall* v. *Newson,* 2 Q. B. D. 102; *Bristol Tramways, &c. Carriage Co. Ltd.* v. *Fiat Motors, Ltd.* [1910] 2 K. B. 831, 841; *Nichol* v. *Godts,* 10 Exch. 191. The plaintiff did not contract to buy seven thousand dozen goat skins, one half of which were to be rotten and worthless. It agreed to buy that number of skins dry-salted, and there was an implied warranty that, with the exception of not more than three per cent thereof, they should be of merchantable quality. *Keown & McEvoy, Inc.* v. *Verlin,* 253 Mass. 374, 377. *Whitty Manuf. Co.* v. *Clark,* 278 Mass. 370. Although it was found that a lot of dry-salted goat skins is deemed of

merchantable quality and reasonably fit for the purpose of making it into leather if the defect here existing is limited to not more than three per cent of the lot, it was found that the first shipment was not merchantable throughout "within this definition, and was not reasonably fit throughout within this definition for the purpose of being made into leather." If the skins had been inspected by the plaintiff before they were subjected to the process of making them into leather, it is found that defects in many of the skins were latent and could not be discovered by inspection. The judge accordingly ruled as follows: "Upon the facts hereinbefore stated, I rule that there was an implied warranty of merchantability as to the goods included in the first shipment. The goods were sold by description. There was no inspection in fact; and inspection would have been not only useless, because the defect was latent, but also impracticable, because the price was to be paid upon delivery of the documents, before delivery of the goods. The defendant was a dealer in goods of the same description. The goods were not sold by any 'patent or other trade name' so as to relieve the seller from implied warranties provided he delivered goods corresponding to the name. . . . Goods are not merchantable simply because their defect is latent and an unsuspecting buyer might be found. . . . Neither are goods merchantable because a fragment of a large lot may be free from defect." It is plain that the evidence warranted these findings, and that the rulings were correct. In *Inter-State Grocer Co.* v. *George William Bentley Co.* 214 Mass. 227, 231, 233, it was said, "Upon the sale of goods, by name or description, in the absence of some other controlling stipulation in the contract, a condition is implied that the goods shall be merchantable under that name. . . . This is not a warranty of quality. . . . It is a requirement of identity between the thing which is described as the subject of the trade and the thing proffered in performance of it. The buyer is entitled to receive goods fairly answerable to the description contained in his contract of sale. . . . The jury must have understood that the plaintiff, in order to prevail, was bound to prove that the

goods were not merchantable at the time they were delivered to the buyer." Where, as here, one half of the skins comprising the first shipment are found to have been defective, it is obvious that they were not of merchantable quality. *Jackson* v. *Rotax Motor & Cycle Co.* [1910] 2 K. B. 937, 949. As the goods were bought by description, G. L. c. 106, § 16, applies.

As the goods were not sold under a patent or trade name, G. L. c. 106, § 17 (4), has no application. The plaintiff was entitled to receive goods which reasonably conformed to the description contained in the contract and this is true whether the defect was hidden or discoverable by inspection. *Inter-State Grocer Co.* v. *George William Bentley Co.* 214 Mass. 227, 231. *Parker* v. *S. G. Shaghalian & Co. Inc.* 244 Mass. 19, 21. Said cl. 4 reads: "In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose." The judge found: "The goods in question, known in the trade as 'Bagdad Goatskins Drysalted,' form a well known article of commerce. The word 'Bagdad' signifies merely that the goat skins were collected in or in the neighborhood of Bagdad. They do not differ essentially from dry-salted goat skins collected in other parts of Asia Minor or India [and] which . . . are known in the trade by the name of the place where they may be collected for shipment." It is manifest that the goods in the present case were raw materials sold for manufacture into leather, and are not commodities which were sold "under . . . [a] patent or other trade name" referred to in said cl. 4. With reference to those same words in the English sale of goods act, it was said by the court in *Gillespie Brothers & Co.* v. *Cheney, Eggar & Co.* [1896] 2 Q. B. 59, at page 64: "That obviously is intended to meet the case, not of the supply of what I may call for this purpose raw commodities or materials, but for the supply of manufactured articles — steam ploughs, or any form of invention which has a known name, and is bought and sold under its known name, patented or otherwise."

2. It is the contention of the defendant that, as there is no express warranty contained in the contracts of sale, none can be implied because of the provision in the contracts which reads: "Sellers have no responsibility whatsoever for the outturn of goods in manufacture." The defendant argues that this provision absolves it from responsibility for breach of any warranty. The "outturn" is the product which is turned out with respect to its quantity or quality, including the product or output of a manufacture or other industry. It is the contention of the defendant that it is not responsible for defects in the skins which existed before delivery but were first discovered by the plaintiff after they had been put in the process of manufacture into leather. We agree with the contention of the plaintiff that this clause cannot be construed as argued by the defendant, but means that the risks and results of the manufacturing process must be assumed by the buyer only after delivery to him of such goods as are described in the contract. The plaintiff contends that the defective condition could not be discovered before the skins were put in process of manufacture, and by that means only could the latent defect be discovered; and the trial judge so found. The claim of the plaintiff is that the goods were defective and of unmerchantable quality when delivered to it, and is not based upon the outturn when the manufacturing process is completed. It is apparent from the findings of the judge that because the defects were hidden they could be discovered only after the skins had been subjected to the process of manufacture.

3. In addition to the claim of the plaintiff that there was a breach of an implied warranty that the goods were of merchantable quality, it contends that there was an implied warranty that they were fit for a particular purpose under G. L. c. 106, § 17 (1). There was evidence that the plaintiff was a tanner, and that its letterhead showed that it was engaged in the business of tanning. One Puech, who was called as a witness by the plaintiff, and was a broker who procured the contracts in question, testified that he had known the plaintiff as a tanner of goat skins

ever since it had been in business; and knew when he sold the skins to the plaintiff that they were wanted for tanning into leather. The defendant knew the plaintiff was a manufacturer of leather and not a dealer in skins. There also was evidence that the plaintiff had previously purchased Bagdad dry-salted skins from the defendant. A representative of the plaintiff testified, in substance, that in 1928, and before these contracts were entered into, he talked with the defendant's representative and told him that a previous purchase of skins from the defendant was satisfactory, and that the plaintiff could use a lot of them if it could get such goods as had previously been sent; that the defendant's representative replied: "You can rely on continuing to get those goods. We have our own men in that country who watch the shipments, who watch the selections. . . ." The plaintiff's representative further testified that in purchasing the merchandise from the defendant he relied upon the defendant's skill and judgment in the selection of the merchandise for the tannery. It could be found on this evidence that the plaintiff made known to the defendant the particular purpose for which the skins were required. The contracts provided that the plaintiff should pay for the goods "Net Cash or Domestic letter of credit against documents . . . . Ten per cent of original packages may be opened for inspection purposes, but otherwise held intact." It thus appears that the plaintiff had no opportunity to inspect ninety per cent of the total shipments. The judge found that the defective condition of the skins was imperceptible upon inspection. Upon the question of an implied warranty of fitness for a particular purpose the judge stated: "I find as a conclusion from the facts hereinbefore stated that the plaintiff, by implication at least, made known to the defendant that the goat skins were required for the particular purpose of making them into leather, and that the plaintiff relied upon the defendant's skill and judgment . . . . I rule that nothing in the contracts or correspondence between the parties prevents the plaintiff from relying upon these implied warranties." An examination of the evidence before the judge

shows that these findings were not unwarranted. From the evidence and the reasonable inferences to be drawn therefrom, a finding that there was a breach of an implied warranty that the goods should be reasonably fit for manufacture into leather was warranted, as it was known by the defendant that the plaintiff was a tanner. The natural purpose of the purchase by the plaintiff was to tan the skins into leather. *Leavitt* v. *Fiberloid Co.* 196 Mass. 440, 451–452. *Farrell* v. *Manhattan Market Co.* 198 Mass. 271. *Inter-State Grocer Co.* v. *George William Bentley Co.* 214 Mass. 227, 231, 232. *Ward* v. *Great Atlantic & Pacific Tea Co.* 231 Mass. 90, and cases cited. *W. R. Grace & Co.* v. *National Wholesale Grocery Co. Inc.* 251 Mass. 251, 254–255, and cases cited. *Manchester Liners, Ltd.* v. *Rea, Ltd.* [1922] 2 A. C. 74, 84.

4. The contracts provide under the title "Claims," "All claims must be made in writing within one week after receipt of the goods. Ten per cent of original packages may be opened for inspection purposes, but otherwise held intact. If buyer fails to present his claim within the specified time or if more than 10% of original packages have been opened, seller is entitled to refuse arbitration . . . ." The contracts also provide for arbitration if any claim is made that the goods are lacking in quality or any other questions arising from the contract "shall as a condition precedent to our acceptance hereof, be settled either by mutual agreement or by arbitration." The method by which the arbitrators shall be selected is therein provided. It is admitted by the plaintiff that it did not make any claim in writing within one week after the receipt of the goods, and that it used more than ten per cent of the original packages, but contends that the clause in question provided the only penalty for noncompliance with these conditions and entitled the defendant "to refuse arbitration." The plaintiff also contends that the statements printed on the defendant's bill heads, "All claims must be made before goods are put into works" and "No claims allowed later than 7 days after receipt of goods," are not made terms of the contracts. It is the contention of the defendant that the provision

under the heading "Claims" is an express agreement respecting the substantive rights of the parties, and that the failure of the plaintiff to present its claim within the specified time, or if more than ten per cent of the original packages. have been opened, when construed with the provision for arbitration, is a bar to recovery. We are of opinion that correctly construed the provisions above referred to are not a bar to recovery, but are limited to giving the seller the right to refuse arbitration. The language of the contract under "Arbitration" and that under "Claims" are to be construed together. There is no express provision in the contracts which bars a buyer from recovery where there has been on the part of the seller a breach of either an express or an implied warranty, and none can be properly inferred.

5. It is the contention of the defendant that, if there were implied warranties in the purchase and sale of the skins, the plaintiff is precluded from recovery for failure to comply with the terms of the contract. The contracts recite: "All claims must be made in writing within one week after receipt of the goods. Ten per cent of original packages may be opened for inspection purposes, but otherwise held intact." There was evidence that the plaintiff first notified Puech, the broker who negotiated the contracts for the defendant, of the defects described in the first lot on March 6; that Puech visited the tannery on March 9 and notified the defendant of the facts as found by the plaintiff on March 10; that the plaintiff directly notified the defendant by letter on March 10 of the defects in the skins. The defendant's representative visited the tannery on March 13 and examined the skins. The evidence shows that they arrived in Boston January 3, 1931, and the manufacture of them began on January 14. There was evidence that in the manufacture into leather the skins are subjected to different processes which require several days; that one lot does not indicate the condition of other lots. Exhibit 23 shows when each lot. was put through each process, and that the first lot treated did not come .out of the beam house where the last process was given until

January 28, 1931. After the first lot, the second started February 4 and was not finished in the beam house until February 18 and showed a small percentage of imperfections. The third lot did not show a large number of defects. Thereafter a larger number of defective skins became apparent. Upon the matter of notice to the defendant the judge states: "I find that the plaintiff gave notice to the defendant of the defect, constituting the alleged breach of warranty, within a reasonable time after the plaintiff knew or ought to have known of such defect. The fact that the first few packs of skins showed the defect was not convincing that the later packs would show the same defect, as is apparent from the nature and cause of the defect, as hereinbefore set forth; and there was always the hope that the later packs would be free from the defect, and that the total number of skins which were defective in the entire shipment would turn out to be less than the three per cent allowance. I find that the plaintiff acted with sufficient promptness." If the defendant intended that the provision with reference to notice was to have a broader scope, it would be easy to have so provided by appropriate language to that effect. The cases cited by the defendant in this connection are not applicable to the contracts here construed. It is obvious that statements printed on the defendant's bill heads are no part of the contracts between the parties. *Picard* v. *Beers*, 195 Mass. 419, 428. *Lalime & Partridge, Inc.* v. *Hobbs*, 255 Mass. 189, 192. In view of the finding that the defective condition of the skins sent to the plaintiff by the first shipment could not be discovered until they had been subjected to the process of manufacture, it cannot be held that the plaintiff is barred from recovery for failure to make a claim within one week after the receipt of the goods, or had failed to notify the defendant of their defective condition within a reasonable time.

6. It appears that the provision for arbitration was waived by both parties. See G. L. c. 251 as amended by St. 1925, c. 294, § 5. The judge correctly ruled that as neither party proposed or refused arbitration in fact, the provision for arbitration became immaterial.

7. The second shipment consisting of thirty-five hundred dozen skins arrived in Boston January 19, 1931. The plaintiff requested an extension of time for paying for this shipment. On January 27, 1931, the defendant assented to such extension provided the goods were placed in the Lynn Storage Warehouse in the name of the defendant until paid for at a later date, and also subject to certain other conditions which need not be referred to in detail. On February 11, 1931, an examination of the second shipment was made on the wharf, in Boston, by an expert employed by the plaintiff. He examined four bales out of the total of three hundred eight bales. He made no objection to the kind or quality of the goods. After this examination the defendant wrote the plaintiff making a new offer to extend the time for payment upon storage of the goods in the warehouse but including as a part of it: "You will confirm to us that you have inspected and approved of these goods," to which the plaintiff, on February 13, replied: "We have made a cursory examination of these goods on the dock and so far as we can see, they are in order. We presume that the balance of the lot are the same as the bales we examined on the dock, but should any difference arise after our examination of the goods at the tannery, we shall, of course, expect that you recognize anything that is not right with these goods. . . ." Thereafter the plaintiff continued to subject to treatment the skins sent in the first shipment, and found as hereinbefore stated that much more than three per cent of them were defective because of rottenness. The judge found that the plaintiff continued to put through its factory and make into leather the entire first shipment so far as they were free from defects and made no offer to return any part of it. He further found that the plaintiff used reasonable care and the most approved methods in handling the skins, and that the result was not attributable in any way to any fault on the part of the plaintiff; that many more than the normal number proved defective; that ten and seventy-seven hundredths per cent were wholly lost or destroyed before reaching the tannery. The plaintiff

refused to receive or to pay for the second shipment unless it received from the defendant some further assurance, in addition to the contracts, that the shipment would not contain over three per cent of defective skins. This the defendant refused to give. The judge found that the defects in the first shipment extended to nearly one half of the skins. After the refusal of the plaintiff to receive and to pay for the second shipment, the defendant made a resale thereof under G. L. c. 106, § 49. The purchase price, according to the contracts was $19,875. The price received upon the resale was $12,105; after deducting from this sum expenses and counsel fees amounting to $815.57, the sum remaining was $8,585.57 which is the damage resulting to the defendant from the failure of the plaintiff to receive and to pay for the second shipment, assuming it was obligated to do so. The question is presented whether the plaintiff was justified in refusing to accept the second shipment. The judge states: "There was no evidence, and no reason to suppose, that the second shipment was defective. But the defect in the first shipment was very important and material . . . . I find, in the language of G. L. c. 106, § 34, that the breach of warranty as to the first shipment was so material as to justify the plaintiff in refusing to proceed further and suing for damages." G. L. c. 106, § 34 (2), reads: "If there is a contract to sell goods to be delivered by stated instalments, which are to be separately paid for, and the seller makes defective deliveries in respect of one or more instalments, or the buyer neglects or refuses to take delivery of or pay for one or more instalments, it depends in each case on the terms of the contract and the circumstances of the case whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for compensation, but not to a right to treat the whole contract as broken." We are of opinion that under this provision of the statute, upon the findings of the judge as to the first shipment, which were warranted, the breach of the contract was so material as to affect the

contracts as a whole, and justified the plaintiff in refusing to proceed with the contracts and suing for damages for breach of the entire contract. It follows that the defendant's counterclaim was rightly dismissed. *Helgar Corp.* v. *Warner's Features, Inc.* 222 N. Y. 449. *Dexter Yarn Co.* v. *American Fabrics Co.* 102 Conn. 529. *Monroe* v. *Diamond,* 279 Penn. St. 310. *American Tube & Stamping Co.* v. *Erie Iron & Steel Co.* 281 Penn. St. 10. *Atlantic City Tire & Rubber Corp.* v. *Southwark Foundry & Machine Co.* 289 Penn. St. 569. *Newton* v. *Bayless Fruit Co.* 155 Ky. 440. *McDonald* v. *Kansas City Bolt & Nut Co.* 149 Fed. Rep. 360. Williston on Sales (2d ed.) §§ 465, 467 (d), and cases cited in note 11, § 467 (e). Williston on Contracts, §§ 866, 867, 868.

8. The defendant contends that the ruling that defects in the goods in the first shipment entitled the plaintiff to refuse to accept and to pay for the second shipment was erroneous, and cites *John Service Inc.* v. *Goodnow-Pearson Co.* 242 Mass. 594. The facts in that case are plainly distinguishable from those in the case at bar. In that case the defendant accepted the first shipment and actually used nearly all of it "for the purpose for which . . . [the goods] were intended" notwithstanding their defective quality, and did so with full knowledge of the plaintiff's breach of warranty and therefore could not rescind the sale. In the present case it was found that "each shipment . . . [contained] a part of the goods contracted for under the earlier and later contract, and neither shipment . . . [was] composed exclusively of goods under one of these contracts as distinguished from the other." In these circumstances the plaintiff was justified in assuming that the second shipment contained defective and worthless skins in excess of three per cent of the total number so shipped. In Williston on Sales (2d ed.) at § 467 (d), it is said where the vendor "has already sent a great quantity of inferior goods, the inevitable consequence is that he will not substantially perform the contract even though all the remaining instalments are what the contract calls for. The buyer should, therefore, be allowed to refuse to go on

with the contract unless he has manifested an election to continue by knowingly and voluntarily accepting inferior goods, or otherwise." Although the plaintiff had an opportunity to inspect all the skins contained in the second shipment, such inspection would not have revealed the defects therein because it is found that such defects could not have been discovered until the skins had been put in process of manufacture into leather. It thus appears, as the judge ruled, that failure of the plaintiff to inspect the entire second shipment is not important. *Procter* v. *Atlantic Fish Co. Ltd.* 208 Mass. 351, 354. See also *Henshaw* v. *Robins,* 9 Met. 83; *Gould* v. *Stein,* 149 Mass. 570; *Carlton* v. *Lombard, Ayres & Co.* 149 N. Y. 137, 145, 149. "As to defects which inspection ought to reveal, the inspection prevents any implied warranty, but otherwise inspection is unimportant." Williston on Sales (2d ed.) § 248. *The St. S. Angelo Toso,* 271 Fed. Rep. 245.

9. The defendant offered to show that, during the time within which claims had to be made, there was "a universal custom in the trade dealing in Bagdad goat skins, that any claim of inferior quality must be made before goods are put into works in order to entitle the claim to any recognition at the hands of the seller." This evidence was excluded subject to the defendant's exception. It is the contention of the defendant and the *amici curiae* that the question is governed by the sales act, G. L. c. 106, § 60, which provides: "If any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom is such as to bind both parties to the contract or sale." This statute, although originally enacted by St. 1908, c. 237, § 71, has never been interpreted by this court. It is plain that the subject is within legislative control. Custom is defined to be "Such a usage as by common consent and uniform practice has become the law of the place, or of the subject-matter, to which it relates." Bouvier's Law Dict. The subject was dealt with at length by this court in *Conahan* v. *Fisher,* 233 Mass. 234, and

cases there reviewed. *Costa* v. *Gorton-Pew Vessels Co.* 242 Mass. 294. *Nowell* v. *Equitable Trust Co.* 249 Mass. 585, 600. See also the English cases *The Turid,* [1921] P. 146; *Scott* v. *Pattison,* (1923) 2 K. B. 723.

The only one of our cases cited in the defendant's brief in support of the admissibility of the custom is *Procter* v. *Atlantic Fish Co. Ltd.* 208 Mass. 351. The contract in litigation in that case was made before, although the case was decided after, the sales act was enacted in this Commonwealth. The case does not seem to have any bearing upon the case at bar.

The corresponding section of the English sales act is in substance the same as ours, but the word "Where" is used in place of "If" as the first word, and the word "usage" is used in place of "custom." 56 & 57 Vict. c. 71, § 55. Section 14 (1), as to implied warranty of fitness when the purpose of the use is made known to the vendor so as to show that the buyer relies on the seller's skill or judgment, and the goods are of a kind which it is the course of the seller's business to supply, is substantially like G. L. c. 106, § 17 (1). The English case of *Cointat* v. *Myham* fully covers the question here involved. As reported in [1913] 2 K. B. 220, there is no reference to this subject. There are two reports of the case, however, before the Court of Appeal: one in 30 T. L. R. 282, and the other in 110 L. T. (N. S.) 749. Each report covers the question here presented, and in its essential facts is the same as the case at bar in that the warranty of fitness was implied by law in the sale of a carcass of a pig for food. The jury found that the purpose for which the carcass was to be used was made known to the seller and that enough was said to show that the vendee relied on the seller's skill and judgment. The trial judge ruled that custom could not override the law as to implied warranty. The custom or usage offered in evidence was that where nothing was said by either vendor or vendee there was no warranty express or implied. Lord Reading, who spoke for the Court of Appeal, said, in effect, that if the attention of the trial judge had been drawn to said § 55 he would not have ruled that "Custom cannot

override the law" but would have directed the jury differently. He treated the point as too plain for discussion. The point is discussed with the same result in Williston on Sales (2d ed.) § 246. See *Deveso* v. *Chandler*, 210 App. Div. (N. Y.) 684, 689, affirmed in 241 N. Y. 559; *DeStefano* v. *Associated Fruit Co.* 318 Ill. 345. G. L. c. 106, § 60, is not referred to in the brief of the plaintiff; the brief merely cites general cases on custom but does not refer to the statute. When the evidence of custom was offered no inquiry was made as to the ground on which the evidence was proffered. The defendant is entitled now to rely on said § 60 even if no one may have had it in mind at the trial. *Parrot* v. *Mexican Central Railway*, 207 Mass. 184, 190. *Proctor* v. *Dillon*, 235 Mass. 538, 540. It results that as the evidence of custom was admissible, the defendant's exception to its exclusion must be sustained. It is not possible to say that it was harmless error.

10. The defendant contends that the damages assessed by the court were erroneous. G. L. c. 106, § 58 (6), provides "The measure of damages for breach of warranty shall be the loss directly and naturally resulting, in the ordinary course of events, from such breach." Clause 7 of the same section reads: "In case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, shall be the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if answering to the warranty." The judge found in addition to the two items not in dispute that the damages by reason of the first shipment not being merchantable throughout were $9,000, and that the damages resulting by reason of the first shipment not being reasonably fit for manufacture into leather were $3,000, making a total of $12,000. The rule adopted by the judge was correct. It was in conformity with G. L. c. 106, § 58 (7), and § 59. *Gascoigne* v. *Cary Brick Co.* 217 Mass. 302, 305. *Country Club Soda Co. Inc.* v. *Arbuckle*, 279 Mass. 121, and cases cited. There was evidence of "special circumstances" showing proximate damages at a greater amount than the difference in

value between the value of the goods at the time of delivery to the plaintiff and the value they would have had if answering to the warranty. G. L. c. 106, § 59. *Gascoigne* v. *Cary Brick Co.* 217 Mass. 302. *Stein* v. *Almeder*, 253 Mass. 200, 204–205. *Country Club Soda Co. Inc.* v.. *Arbuckle*, 279 Mass. 121, 133–135.

A final decree was entered by which it was ordered that the defendant's counter claim be dismissed, and that the defendant pay to the plaintiff the sum of $17,930.11; this amount included the sums of $4,633.43 and $500, which, it was agreed, the defendant owed the plaintiff.

As the evidence of custom offered by the defendant was wrongly excluded, the final decree must be reversed. The case is remanded to the Superior Court. All findings of fact made by the trial judge are to stand and be accepted as true in further proceedings. Further trial is limited to a determination of the question, whether there was a universal custom in the trade, dealing in Bagdad goat skins, that any claim of inferior quality must be made before the goods are put into works, in order to entitle the claim to any recognition at the hands of the seller, such as to bar the plaintiff from recovering on either or both contracts between the parties as to sales of Bagdad goat skins in view of the facts already found and established by this opinion. *Simmons* v. *Fish*, 210 Mass. 563. After making such findings an appropriate final decree disposing of the case is to be entered.

*Ordered accordingly.*