Fred **HARTNETT**, Appellant,

v.

**BROWN & BIGELOW**, a Division of **Standard Packaging Corporation**, Appellee.

No. 9650.

United States Court of Appeals Tenth Circuit.

May 15, 1968.

G. J. Cardine, Casper, Wyo., for appellant.

Morris R. Massey, Casper, Wyo., for appellee.

Before MARVIN JONES *, Senior Judge, United States Court of Claims, and LEWIS and BREITENSTEIN, Circuit Judges.

MARVIN JONES, Senior Judge:

This is an appeal from a judgment in the net sum of $5,746.48 in favor of Brown & Bigelow, plaintiff below, against defendant Fred Hartnett in the United States District Court for the District of Wyoming. The controversy arises over a large number of etchings which had been ordered from Brown & Bigelow by appellant Hartnett through Charles Kinsey, who had been a salesman for Brown & Bigelow.

The main issue was whether the etchings, which had been machine mounted, were defective and unmerchantable and failed to measure up to the quality of the samples, which had been hand mounted and which were the basis of the order. There naturally are a number of collateral issues growing out of the resale to customers in many states.

### Summary of the Facts

On March 18, 1965, Fred Hartnett contracted to purchase from Brown & Bigelow 100,000 gold print Ettinger etchings and 100,000 copper print Palenske etchings. One half of the etchings were to be delivered on June 1, 1965, and one half on March 1, 1966.

---

* Sitting by designation of the Chief Justice.

By supplemental order 25,000 decks of playing cards were also to be delivered, one half on each etching delivery date. Hartnett was to pay $26,848.00 [1] for the first shipment of etchings and cards and $25,591.48 for the second shipment. These sums included $5,746.48 for each delivery of playing cards.

All parties apparently knew that Hartnett was purchasing the items for resale. Hartnett sold the etchings to Kinsey who planned through Golden Elk, a Wyoming corporation, to resell them in the open market all over the country.

Before he placed the order, Hartnett was shown handmounted sample etchings on white backboards. The etchings were described in the Brown & Bigelow order forms. The evidence showed that the order was signed in reliance upon the description and samples that were exhibited.

Four hundred sets of each type of etching were delivered by Brown & Bigelow by early air freight. Golden Elk used half of this air shipment as samples for a selling group. The other half of that shipment was then sold retail in the Yellowstone Park area. This air freight shipment conformed to the samples, contained no defects, and was of the quality represented.

Soon after the air freight shipment was sent, Brown & Bigelow shipped the remainder of the first half of the total contract, or 50,000 sets of each type of etching. Hartnett soon thereafter remitted $26,848.00, which covered the June shipment of one half of the total order of 200,000 sets of etchings and one half the total, or 12,500 sets of playing cards.

Upon delivery of the first half of the total contract, the sales force of Golden Elk began sales in 30 states. In September 1965, Kinsey of Golden Elk began encountering defective etchings. This did not bother him at first, as he had expected a few. However, by October, Golden Elk and Hartnett began to receive an alarming number of complaints of defective etchings. Kinsey began forwarding defective etchings to Hartnett and complained of difficulty in attempting to put together display boards containing four good etchings, and further sales gradually ended.

It appears that in filling the order 4 etchings were placed in each envelope, then stacked into groups of 25, then placed in boxes of 100 sets, each set being sealed for shipment to Hartnett and reshipment by Hartnett to Golden Elk.

Brown & Bigelow had ordered the etchings from Germany, and after mounting the samples by hand had then mounted the two major installments of etchings upon a white backboard by a process known as tipping. The mounting was done by a tipping machine constructed by Brown & Bigelow by converting a used printing press into a machine for that purpose. The machine could mount 2,500 etchings per hour. The etchings were fed into the tipping machine through a roller, which ran across the middle of each etching. This was for the purpose of pressing down so that the glue that had been placed either on the back of the etching or on the front of the backboard would hold the etching in place until the glue hardened.

The entire 200,000 etchings were run through the machine in one continuous operation.

Through an attorney, Hartnett notified Brown & Bigelow of the alleged defective merchandise and of his recision of the contract. This was done by letter dated November 17, 1965.

After a meeting of the parties at which they failed to reach any agreement, Brown & Bigelow filed suit for $25,591.48, the contract price of the second half of the order, or second installment, which was still undelivered.

Hartnett entered a general denial and filed a counterclaim seeking to rescind the order and agreement of March 1965, and in the alternative pleaded for the recovery of damages for breach of the

---

1. This included 400 sets of each type of etching that were sent by early air freight.

contract by Brown & Bigelow for its alleged failure to deliver merchandise of the quality shown by the samples and for its delivery of unmerchantable etchings.

There was some conflict in the testimony. Brown & Bigelow presented testimony to the effect that 500 sets of the etchings were opened and only three were found to be defective. Hartnett offered evidence of numerous complaints as to the defective quality and unsatisfactory condition of the etchings, of customers' refusals to account for etchings that were unacceptable, and of their declining to order any further etchings.

The defects in the etchings were scratches or markings across the middle of the etchings. The only expert witness who testified was one T. Guard, called by Hartnett, who testified he had been in printing and allied trades 45 years, had worked in large plants, had owned his own plant and had operated his own engraving plant in making etchings. He testified that an artist does the work by hand and that mounting in some cases is still done by hand, but there are high speed machines with belts and conveyors that hold the two pieces together and glue them in place.

Guard examined several exhibits from defendant's display. He said there was a band of damage across the center of these etchings. He further said that in his opinion the defects were produced by a mechanically defective machine, and that these defective etchings were of no value whatever. The superintendent of Brown & Bigelow's operations also admitted that the etchings were mounted by a used printing press that had been made over into a tipping machine.

The order or contract stipulated that it should be governed by Minnesota law. Neither party has contested this provision.

The trial court instructed the jury in an elaborate charge, quoting many provisions of the Minnesota statutes, some of which were somewhat technical. While the statutes were correctly worded, they may have tended to confuse the jury, which had not made a study of the technical terms of the law.

*The Verdict*

The jury returned the following verdict:

We, the jury duly empaneled in the above-entitled case, upon the issues joined, do find for the plaintiff, Brown & Bigelow, a Division of Standard Packaging Corporation, on the contract, and award it the sum of $19,-845.00.

We further find that the merchandise sold and delivered to the defendant, Fred Hartnett, was materially defective and unmerchantable in many respects and was inferior to the samples of said merchandise exhibited to the defendant prior to the sale, and we assess damages to said defendant for breach of contract in the amount of $14,098.52.

We further find that the plaintiff, Brown & Bigelow, a Division of Standard Packaging Corporation, is entitled to receive on the contract the net sum of $5,746.48.

██ It is impossible to harmonize the verdict of the jury within its different parts and with the facts and law of the case.[2] This is not the jury's fault. The form was prepared for them. With the complicated charge, and especially with the numerous quotations of the technical provisions of the statutes, some of which had little to do with the real issues in the case, the jury had a most difficult assignment.

In the first place, the verdict and judgment were incomplete. They make no disposition of the second installment of property, the etchings and playing cards still in the hands of Brown & Bigelow. This could of course be corrected by amending the judgment or by supplemental order.

**2.** A verdict finding matters uncertainly and ambiguously is insufficient to support a judgment. Prentice v. Zane's Adm'r, 49 U.S. (8 How.) 470, 12 L.Ed. 1160 (1850).

It will be noted that the only specific finding in the verdict is the one which finds that the delivered merchandise (the first installment) "was materially defective and unmerchantable and was inferior to the samples exhibited to the defendant prior to the sale, and we assess damages to said defendant for breach of contract in the amount of $14,098.52." If this specific finding stood alone, there would be no doubt of Hartnett's right to rescind the contract and to refuse to accept any further shipment, provided he notified Brown & Bigelow of the defective merchandise within a reasonable time after its discovery.

Who, expecting to stay in business, would want to handle merchandise that is 50 percent defective and unmerchantable? It would make it exceedingly difficult to continue that or any other kind of business with the same customers. This is especially true of art work, which is of a delicate nature. As the expert Guard testified, any defect "ruins art work." An etching is considered art work and, according to the expert testimony, if damaged or marked it has "no value whatever." Then, too, it would be a difficult task to go through 200,000 etchings and carefully search out the defective ones.

■ The jury was given no form of verdict to the effect that if the first installment of delivered etchings was defective and did not comply with the samples, Hartnett had the right to cancel for breach of contract and refuse to accept any further deliveries. This is such an important issue that it should have been expressed in simple terms and a form of verdict given to embody such a result, rather than leaving it to implication.

There were two other jury findings which complicate the verdict and judgment. The jury found for Brown & Bigelow a general verdict in the sum of $19,845.00. Then it evidently subtracted from this figure the amount of damages on the first installment and came up in the third paragraph with a net judgment

for Brown & Bigelow in the sum of $5,746.48. The verdict makes no reference to the damaged nature of the second installment.

It is abundantly evident that the second installment, still in possession of Brown & Bigelow, is exactly the same quality as the first installment. They were all run off in a continuous operation, both installments being prepared at the same time before either of the two main installments were shipped. The entire operation was run through the made-over printing press. Neither of the two main installments was hand mounted as were the samples. This is made clear in the record. In fact, counsel for Brown & Bigelow in oral argument, in response to a question, readily admitted that the entire machine operation in mounting both installments was begun and completed in one continuous process. There is not the slightest doubt that the second installment is of the exact quality of the first, including the same defects.

We think that on a retrial these issues should be submitted in simple language with a proper form of verdict. These issues are too important to be left in a nebulous condition, or allowed to be resolved by implication.

■■ The jury should be instructed that if the etchings delivered were equal in quality with the samples and if there were no substantial defects in any of the machine-mounted etchings, the plaintiff should recover the full contract price on delivering the entire second installment; but if the first installment of machine-mounted etchings or a substantial number of them were defective or unmerchantable, the defendant had a right to cancel the remainder of the contract. Minn. Stat. § 512.45 (1945); Inland Products Corporation v. Donovan, Inc., 240 Minn. 365, 62 N.W.2d 211 (1953). See also Agoos Kid Company v. Blumenthal Import Corporation, 282 Mass. 1, 184 N.E. 279 (1932), construing a similar Massachusetts statute, and citing other authorities. If defendant did not notify Brown & Bigelow within a reasonable

time he would still be entitled to any damages that may have been caused by such defects. As a matter of fact the plaintiff was notified of the defects in the first installment long before the time for shipment of the second installment. Any delay in notification could not possibly have injured plaintiff in connection with the second installment.

The playing cards were not defective. They were ordered by Hartnett, and while they were apparently intended to aid in the disposition of the etchings, nevertheless they were not solicited by Brown & Bigelow. They were in a separate and supplemental order. The second installment of 12,500 decks of playing cards should be charged to Hartnett on delivery.

It was suggested in oral argument that this court, if possible, should make final disposition of the case in order to avoid the time and expense of a new trial. We do not have authority to modify a verdict of the jury, which passed upon the issues of fact.

Reversed and remanded.