GLENWOOD RANGE COMPANY, a
body corporate,

v.

UNIVERSAL MAJOR ELEC. APPLI-
ANCES, Inc., a body corporate.
Civ. A. No. 6313.

United States District Court
D. Maryland, Civil Division.

Sept. 16, 1954.

William D. Macmillan, William A. Fisher, Jr., and Semmes, Bowen & Semmes, Baltimore, Md., and Neil Leonard, Francis S. Moulton, Jr., and Bingham, Dana & Gould, Boston, Mass., for plaintiff.

Philander B. Briscoe, Baltimore, Md., and John P. Hampton, Louis Linton Dent and Norville & Dent, Chicago, Ill., for defendant.

THOMSEN, District Judge.

Defendant's motion for judgment n. o. v. or, in the alternative, for a new trial requires a consideration of all the evidence in the case.

Glenwood Range Company, of Taunton, Mass. (Glenwood), has been engaged in the business of manufacturing and selling various types of stoves for approximately 75 years. In 1950 its officials were considering the desirability of adding to its line refrigerators and other household appliances, to be purchased by Glenwood from their respective manufacturers. The officers of Glenwood conferred and corresponded with the officers of Artkraft Manufacturing Company, of Lima, Ohio (Artkraft), which has since merged into defendant, Universal Major Elec. Appliances, Inc. Malcolm Leach, Glenwood's vice president in charge of sales, and Newman, its sales manager, visited Lima, where they toured Artkraft's plant and display rooms and discussed contract terms. They were shown at least two refrigerators of the type Artkraft manufactured for its various customers. One was a 10 cubic foot refrigerator, which was described as having a frozen food storage capacity of approximately 70 pounds. The other was a 9 cubic foot model, which was described as having a frozen food storage capacity of approximately 52 pounds. All of the refrigerators of each model which Artkraft manufactured for its customers were manufactured from the same dies and jigs and were the same for each customer, except for trim and minor features. Edelmuth, Artkraft's sales manager, showed Malcolm Leach advertising matter describing the refrigerators put out by various customers of Artkraft, and also showed him a number of models of refrigerators manufactured by competitors, such as Crosley, Philco and Frigidaire.

A special feature of the Artkraft refrigerator was that the refrigerating coils were embedded in three horizontal plates extending the width of the refrigerator. An enclosed freezer or frozen food storage compartment ran all the way across the top of the refrigerator, and a large "chill tray" was placed across the top of the general food storage area, directly under one of the plates. An Artkraft engineer, Money, had pioneered this development, which was later adopted, to some extent at least, by other manufacturers. In 1950, however, most of the household refrigerators which contained a frozen food storage compartment had an insulated strip or baffle between that compartment and the main storage area of the refrigerator. Since the Artkraft refrigerator had no insulating baffle between the freezing plates and the chill tray, the chill tray in the Artkraft refrigerator was designed to keep foods at a lower temperature than similar trays in other refrigerators. As a result, refrigerators manufactured by Artkraft were advertised and described as having a larger frozen food storage capacity than refrigerators of similar size put out by other manufacturers.

Malcolm Leach talked to Artkraft's president, Clark, again early in January, 1951, and Edelmuth came to Taunton on January 19, 1951. In the meantime Artkraft had sent Glenwood a draft of a proposed contract, and Edelmuth brought the proposed contract with him to Taunton, already executed on behalf of Artkraft. It was in the form of a letter, dated January 19, 1951, from Artkraft to Glenwood, which read as follows:

"We are pleased to submit herewith our proposal for the manufacture of private brand refrigerators, per our several discussions with your good organization. I am submitting it in triplicate and when signed by both parties, it will become an agreement.

"This will constitute an order for 2400 refrigerators to be delivered at approximately 1/12 per month for twelve (12) months, and unless cancelled thirty (30) days before expiration of any one year period, shall continue on from year to year on a like basis.

\*  \*  \*  \*  \*  \*

"You are to advance to us $5.00 per refrigerator for the total amount covered under this contract, and we will amortize back to you at the rate of $4.00 per refrigerator, so that you will have all your money back in fifteen months, or less.

"Terms are Net Cash, 10th and 25th prox.

"The method of costing this refrigerator to you will be as follows:

\* \* \* \* \* \*

"Each refrigerator will bear a standard warranty by our factory for one year against defects in material or workmanship. If you desire to reinsure your five year warranty, you can do so through Marsh and McLennan, brokers in Chicago, who have submitted a proposal based on insurance in the St. Paul Mercury Company, or the Zurich Company of Switzerland, I believe you have one of their proposal books. \* \* \* "

The refrigerators were not more specifically described in the letter. After some discussion, the letter contract was accepted and signed on behalf of Glenwood.

Immediately thereafter, the parties discussed a page to be inserted in Glenwood's catalog. A draft of that page, which had either been dictated by Edelmuth, or prepared by Glenwood from information furnished by Edelmuth, was shown to Edelmuth at that time and was corrected by him in his own handwriting. Its essential wording, as corrected by Edelmuth, was as follows:

"Model GMD-10-70 — Equipped with freezer 70 pounds frozen food storage. Two large porcelain crisper pans \* \* \* 14¾ qt. each moist storage capacity. \* \* \* Exclusive three plate horizontal leak-proof evaporator. Mammoth meat keeper and chill tray. \* \* \*

"Model GHD-9-52 — Equipped with freezer 52 pounds frozen food capacity. One porcelain crisper pan.

Mammoth meat keeper and chill tray. \* \* \* "

Deliveries began in February, 1951. One of the first refrigerators delivered was placed in Glenwood's testing laboratory, which was in charge of an engineer, a graduate of M.I.T., who specialized in gas engineering and was said by Glenwood's witnesses to know nothing about electric refrigerators. There is no evidence that any tests were made on this refrigerator, but there is some evidence that water kept in the storage area tended to freeze. In all, Artkraft delivered 1024 refrigerators and one sample freezer before the end of July, 1951.

At the time the contract was made in January, 1951, the market for refrigerators was very good and materials for manufacturing them were in short supply. At or about the time the first refrigerators were delivered the market broke badly, and Glenwood's salesmen, inexperienced in the sale of refrigerators, had great difficulty in disposing of any refrigerators. By the end of July, 1951, less than half of the 1024 refrigerators had been sold to dealers, and very few had been sold by dealers to their customers. There were a few complaints about performance.

In July, 1951, Glenwood called a meeting of its salesmen, which was addressed by Edelmuth. At that meeting, the question arose whether the chill tray was included in the freezing and frozen food storage capacity of the Artkraft refrigerators. Glenwood had hired one salesman who knew something about refrigerators, and he commented on the fact that, according to N.E.M.A. (National Electrical Manufacturers Association) standards, the chill tray should not be included in the frozen food storage computation. Edelmuth, however, stated that it was so included in the Artkraft refrigerator, and that it was proper for Glenwood's salesmen to sell on that basis.

Glenwood continued to have difficulty in disposing of the refrigerators. In late May, 1951, Glenwood had made a reduc-

tion in price. In the summer of 1951, it made another reduction, which brought the price down to Glenwood's cost. It made a third reduction in price sometime in 1952. Various promotional efforts were also made to dispose of the refrigerators.

Meanwhile, Glenwood asked Artkraft to release it from the obligation to take 200 refrigerators per month during the balance of the year 1951 and to permit it to take the additional units in later months. There was also some correspondence about the possibility of taking other models or freezers. Artkraft granted Glenwood's requests for such delays, but the contract was not otherwise modified before November, 1951.

During this time, Artkraft was holding a considerable inventory of materials which it had accumulated for the manufacture of refrigerators for Glenwood and other customers, some of it having been purchased at high prices during the period of scarcity. Walker Leach, Glenwood's president, testified that in November, 1951, Clark, Artkraft's president, called him on the telephone at his home, where he had been ill, told him that Artkraft wanted some money to finance this inventory, and requested him to advance $40,000 on account of the refrigerators not yet delivered. Walker Leach testified that Clark told him that if it developed later that Glenwood could not use or sell all of the refrigerators that were called for under the contract, he (Clark) would cancel the contract. Clark testified that he asked for the money originally on the basis of a purchase of an undivided interest in the inventory, but denied that he made any offer to cancel. After some correspondence and another telephonse conversation, which will be discussed under Point IV below, Walker Leach sent Clark Glenwood's check for $40,000. There was some later correspondence about whether the $40,000 should be considered a purchase of a part of the inventory, but at the trial the parties agreed that it should be considered a payment on account of undelivered refrigerators.

Meanwhile, Glenwood had been receiving various complaints about a few of the refrigerators which had been sold. Some parts had been returned to Artkraft and taken care of under the warranty. Neither Malcolm Leach nor Walker Leach had any substantial knowledge of such complaints until December, 1951; Glenwood's sales manager, Newman, and service manager, Briggs, had handled such complaints as were made. Briggs says that he checked the complaints more closely after a conversation with Malcolm Leach early in November, 1951.

About Christmas, 1951, the Leaches became more worried about the fact that the refrigerators were moving so slowly and got an informal report of the complaints from Briggs, who made a fuller report on January 8, 1952.

Whether because of these complaints, or for other reasons, Glenwood consulted counsel, and on January 25, 1952, wrote Artkraft, saying that during recent months Glenwood had received an increasingly large number of complaints, exceeding normal expectations, about the refrigerators; that "the defects complained of are of such a serious and fundamental nature that it is apparent that not only are these refrigerators not as you represented them to be but that they are not of proper quality and are entirely unfit for the use for which they were intended"; that "the defective quality of your product and its failure to meet standards which you said it would" was "so material and serious a breach of the contract" that Glenwood would not order or accept any more refrigerators. The letter ended with a demand for return of the $7,912 (balance of $12,000) and $40,000 advances, and damages.

Artkraft requested further details of the alleged defects, and on March 4, 1952, Glenwood wrote Artkraft referring to fundamental defects in design and manufacture, defective units, fit and finish, failure of the boxes to maintain the proper temperature, and excessive sweating and dripping. The letter stated that since normally the boxes were not un-

crated until they reached the "consuming public", Glenwood had only recently realized the widespread nature of the defects.

Before the letter of January 25, 1952, Glenwood had had no tests of the refrigerators or of their performance made by experts, nor had it sought any expert advice. In January, 1952, Briggs telephoned the N.E.M.A. and secured a copy of its regulations. In February, 1952, Tucker, of the United States Testing Company, made preliminary tests on four refrigerators, and made more elaborate tests later on a larger number. Norton, a food consultant, who had been in the frozen food business for about 20 years, made various tests on two of the refrigerators. Both Tucker and Norton testified at the trial.

The matter dragged until January, 1953, when Glenwood filed a complaint against Artkraft in this court, in which it claimed $200,000, including the $7,912 balance of the original deposit of $12,-000, the $40,000 paid in December, 1951, and damages caused by alleged breach of warranty and deceit on the part of Artkraft. Artkraft's motion to dismiss the original complaint was granted, with leave to amend, and Glenwood thereafter filed an amended complaint in which all of its various claims and charges were lumped in a single cause of action. Artkraft answered this complaint and made a counterclaim against Glenwood for $300,000 damages because of Glenwood's refusal to take the balance of the refrigerators covered by the contract.

The case was tried before a jury. At the conclusion of plaintiff's evidence, I ruled as a matter of law that there was no evidence legally sufficient to prove a cause of action for deceit against Artkraft, but the case continued on Glenwood's claim for breach of express and implied warranties and Artkraft's counterclaim for breach of contract. At the conclusion of all the evidence, I ruled, as a matter of law, that Glenwood was bound to accept and Artkraft was bound to deliver refrigerators "which would freeze food and keep it frozen in general accordance with the standard of performance of other refrigerators with freezer compartments on the market in the fall of 1950 and in January 1951. The 10–70 models were to have a frozen food storage capacity of approximately 70 pounds and the 9–52 models were to have a frozen food storage capacity of 52 pounds." I ruled that under Massachusetts law the jury could not consider as part of the contract certain specific warranties which Glenwood claimed Artkraft had made. I further ruled, as a matter of law, that Glenwood was not entitled to collect damages from Artkraft for any breach of implied warranty with respect to the refrigerators already delivered because Glenwood had not notified Artkraft of the alleged breach within a reasonable time after Glenwood knew or should have known of such breach, as required by Section 49 of the Uniform Sales Act. I ruled, however, and charged the jury that such failure on the part of Glenwood would not bar Glenwood's right to refuse to accept additional refrigerators under the contract if the jury found that the refrigerators were not of merchantable quality. The charge continued:

"If the jury finds either that the refrigerators did not meet this test, as outlined, or that Clark offered in November, 1951 to cancel the contract if it developed later that Glenwood could not use or sell all of the refrigerators called for by the contract and that Glenwood requested or demanded that Artkraft cancel the contract pursuant to such agreement, then if the jury so find, their verdict shall be for the plaintiff for $47,904, with interest in the discretion of the jury."

On the other hand, I charged that if the refrigerators were merchantable, as described in the contract, Artkraft had the right to retain the $47,904 advances and had a right to recover any additional damages above that amount which the jury might find it had sustained. The

jury was required to bring in not only a general verdict but also to answer the following questions:

"Question No. 1.

"Would the refrigerators furnished by Artkraft to Glenwood under the contract freeze food and keep in frozen storage 70 pounds of food in the case of the Model 10–70, and 52 pounds in the case of the Model 9–52, in general accordance with the standard of performance of other refrigerators with freezer compartments on the market at the time the contract was made?"

"Question No. 2A.

"2A. Did Artkraft's president Norton L. Clark tell Glenwood's president Walker Leach on or about November 24, 1951, when Clark asked for the advance of $40,000, that if it developed later that Glenwood could not use or sell all of the refrigerators called for by the contract, he (Clark) would cancel the contract?"

"Question No. 2B.

"If the answer to Question 2A is No, it is not necessary to answer Question 2B. If the answer to Question 2A is Yes, the jury should answer Question 2B:

"2B. Did Glenwood request or demand that Artkraft cancel the contract pursuant to such agreement?"

Neither side took any exception to the charge.

The jury had given careful consideration to the evidence during the long trial, and deliberated several hours. It rendered its verdict in favor of plaintiff for $47,904, allowing no interest, and answered Question 1 "No" and Questions 2A and 2B "Yes". Defendant has filed a motion for judgment n. o. v. and, in the alternative, for a new trial.

The parties are agreed that the case is controlled by Massachusetts law. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Hardware Mutual Casualty Co. v. Wendlinger, 4 Cir., 146 F.2d 984; Coca-Cola Co. v. Dixi-Cola Laboratories, 4 Cir., 155 F.2d 59; MacKubin v. Curtiss-Wright Corp., 190 Md. 52, 57 A.2d 318.

The Uniform Sales Act is in force in Massachusetts. The relevant sections of that Act are set out below.[1]

I. Defendant contends that "by the

---

1. Uniform Sales Act, § 14, Annotated Laws of Mass. Ch. 106, § 16.

"*Implied warranty in sale by description.*—Where there is a contract to sell or a sale of goods by description, there is an implied warranty that the goods shall correspond with the description and if the contract or sale be by sample, as well as by description, it is not sufficient that the bulk of the goods corresponds with the sample if the goods do not also correspond with the description."
U.S.A. § 15(2) and (6), Mass. § 17(2) and (6).

"*Implied warranties of quality.*—Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:
* * * * * *
"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not),

there is an implied warranty that the goods shall be of merchantable quality.
* * * * * *
"(6) An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith."
U.S.A. § 45, Mass. § 34.

"*Delivery in instalments.*—(1) Unless otherwise agreed, the buyer of goods is not bound to accept delivery thereof by instalments.

"(2) Where there is a contract to sell goods to be delivered by stated instalments, which are to be separately paid for, and the seller makes defective deliveries in respect of one or more instalments, or the buyer neglects or refuses to take delivery of or pay for one or more instalments, it depends in each case on the terms of the contract and the circumstances of the case, whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or

specific language of the warranty given by defendant to plaintiff, as determined by the contract and testimony of Malcolm Leach, other specific and implied warranties were excluded, (and) the court should have instructed the jury to find the issues in favor of the defendant".

■ The written contract in the case at bar was only a partial integration of the parties' agreement. On subjects not covered by the written contract, parol evidence is admissible. On subjects covered by the written contract, parol evidence is not admissible to alter or vary its terms. In case of ambiguity in the written contract, however, parol evidence is admissible to show what the parties meant by the writing. Grace & Co. v. National Wholesale Grocery Co., 251 Mass. 251, 146 N.E. 908; Smith v. Vose & Sons Piano Co., 194 Mass. 193, 80 N.E. 527, 9 L.R.A.,N.S., 966; Putnam-Hooker Co. v. Hewins, 204 Mass. 426, 90 N.E. 983; Glackin v. Bennett, 226 Mass. 316, 115 N.E. 490; Agoos Kid Co., Inc. v. Blumenthal Import Corp., 282 Mass. 1, 184 N.E. 279; Sokoloski v. Splann, 311 Mass. 203, 40 N.E.2d 874; Leavitt v. Fiberloid Co., 196 Mass. 440, 82 N.E. 682, 15 L.R.A.,N.S., 855. The Leavitt case was quoted with approval by Judge Parker in Distillers Distributing Corp. v.

Sherwood Distilling Co., 4 Cir., 180 F.2d 800.

In view of the fact that the contract contained the specific warranty quoted above, I ruled that none of the other specific warranties alleged by Glenwood, and testified to by its witnesses, might be considered by the jury. Glackin v. Bennett, 226 Mass. 316, 115 N.E. 490; Boston Consolidated Gas Co. v. Folsom, 237 Mass. 565, 130 N.E. 197; Barrett Co. v. Panther Rubber Mfg. Co., 1 Cir., 24 F.2d 329; Williston on Sales (Rev. Ed.) Sec. 215. The specific warranties so excluded from consideration of the jury included:

(1) That the enclosed frozen food storage compartment in the upper part of the Model 10–70 refrigerator would freeze and store 70 pounds of frozen food, apart from the so-called chill tray. The corresponding figure for the Model 9–52 was 52 pounds;

(2) That the refrigerator was so designed that at the normal setting the compressor would cut in when the temperature of the horizontal plates was 10 or 15 degrees above zero, and would cut off when the temperature of these plates was zero degrees Fahrenheit; and at the coldest setting the compressor would cut

whether the breach is severable, giving rise to a claim for compensation but not to a right to treat the whole contract as broken."
U.S.A. § 49, Mass. § 38.
"*Acceptance does not bar action for damages.*—In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."
U.S.A. § 69(1) (d) and (3), Mass. § 58 (1) (d) and (3).
"*Remedies for breach of warranty.*—(1) Where there is a breach of warranty by the seller, the buyer may, at his election—

* * * * * *
"(d) Rescind the contract to sell or the sale and refuse to receive the goods or if the goods have already been received, return them or offer to return them to the seller and recover the price or any part thereof which has been paid.
* * * * * *
"(3) Where the goods have been delivered to the buyer, he cannot rescind the sale if he knew of the breach of warranty when he accepted the goods, or if he fails to notify the seller within a reasonable time of the election to rescind, or if he fails to return or to offer to return the goods to the seller in substantially as good condition as they were in at the time the property was transferred to the buyer. But if deterioration or injury of the goods is due to the breach of warranty, such deterioration or injury shall not prevent the buyer from returning or offering to return the goods to the seller and rescinding the sale."

in at zero degrees Fahrenheit and would cut off at minus 10 degrees;

(3) That the freezing area across the top (whether such area be considered (a) the enclosed compartment alone, or (b) the enclosed compartment plus the chill tray) provided a larger freezing or frozen food storage area than any other competition in that size box at anywhere near that price;

(4) That the replacement of the refrigeration units would be less than one per cent; and

(5) That the freezing and the frozen food storage portion of the box would perform like a home freezer.

Defendant contends that the requirements that the refrigerators freeze food, that the 10 cubic foot model have a frozen food storage capacity of 70 pounds and that the 9 cubic foot model have a frozen food storage capacity of 52 pounds, are also specific warranties and should also have been excluded from the consideration of the jury; that under the contract it sold "refrigerators"; that it was required merely to furnish refrigerators similar to those shown to Glenwood's representatives in Lima; and that it is immaterial whether or not such refrigerators would freeze food or keep any quantity of food in frozen storage so long as they could be sold as refrigerators.

It is apparent from all of the evidence, however, that the parties were not buying and selling ordinary refrigerators, but were buying and selling refrigerators which would freeze food and keep food in frozen storage. The written contract did not refer to any samples, nor did it state what size or model refrigerators were to be supplied, nor how many of each. Parol evidence, therefore, is admissible to show what kind of refrigerators were intended to be covered by the contract. The uncontradicted evidence shows that the refrigerators were sold as refrigerators which would freeze food and keep it in frozen storage; that the model 10 refrigerator was described as a refrigerator which would keep in frozen storage 70 pounds of food; and that the model 9 was described as a refrigerator which would keep in frozen storage 52 pounds of food. The oral testimony to this effect is supported (1) by the advertisements of other refrigerators manufactured by Artkraft, which were given by Artkraft's representatives to Glenwood's representatives before the contract was made, and more importantly (2) by the draft of the proposed page for Glenwood's catalog, which was prepared at or about the time that the contract was executed. This draft was either dictated by Edelmuth, Artkraft's sales manager, or by someone at Glenwood from information furnished by Edelmuth. In either event, the draft was corrected by Edelmuth in his own handwriting on the same day the contract was executed. This draft, as corrected by Edelmuth, described the refrigerators as follows:

"Model GMD–10–70 — Equipped with freezer. 70 pounds frozen food storage. Two large porcelain crisper pans * * * 14¾ qt. each moist storage capacity. Exclusive three plate horizontal leak-proof evaporator. Mammoth meat keeper and chill tray. * * *

"Model GHD–9–52 — Equipped with freezer. 52 pounds frozen food capacity. One porcelain crisper pan. Mammoth meat keeper and chill tray. * * *"

Under the Massachusetts cases cited above, Artkraft was required to supply, and Glenwood was required to accept, refrigerators which (as I charged the jury):

" * * * would freeze food and keep it frozen in general accordance with the standard of performance of other refrigerators with freezer compartments on the market in the fall of 1950 and in January 1951. The 10–70 models were to have a frozen food storage capacity of approximately 70 pounds and the 9–52 models were to have a frozen food storage capacity of 52 pounds.

"It was not necessary that this 70 pound frozen food storage capacity be in the enclosed upper compartment; it could be either in that box or in the chill tray or both, or elsewhere, * * *."

■ II. The express warranty in the contract did not exclude an implied warranty of merchantability of the goods sold. Uniform Sales Act, §§ 14 and 15 (2) and (6). The express warranty in the contract dealt with defects in workmanship or material, and Artkraft's obligation to replace defective parts. This express warranty was not inconsistent with an implied warranty that the goods were of merchantable quality and reasonably fit for the purpose for which they were sold.

Defendant contends that there is no evidence in the case which proves or tends to prove the standards of merchantable quality against which the jury was to compare the quality of the refrigerators in question.

■ Under the implied warranty of merchantable quality, Artkraft was obliged to furnish, and Glenwood was obliged to accept, refrigerators of similar quality to those shown to plaintiff's representatives at Lima and at Chicago (with the changes in accessories agreed upon by the parties), and which would freeze food and keep it frozen in general accordance with the standard of performance of other refrigerators with freezer compartments on the market in the fall of 1950 and in January, 1951. The jury was so instructed. The charge continued:

"Artkraft was bound to furnish and Glenwood was bound to accept refrigerators of merchantable quality. The term 'merchantable quality' * * * means that the goods are reasonably suitable for the ordinary uses for which goods of that description are sold. In this case it means that the refrigerator did not have to be of the highest quality, nor perform as well as commercial refrigeration or cold storage plants,

or even as well as household freezers which are not used as household refrigerators, which are opened and closed during the day more frequently; but they did have to perform in general accordance with the standard of performance of other refrigerators with freezer compartments on the market at the time the contract was made.

"The Court further instructs the jury that it would not constitute a breach of the warranty that the refrigerators would be of merchantable quality for the defendant to deliver to the plaintiff a small number of defective refrigerators. The warranty contained in the written contract against defective workmanship and material was contemplated by the parties to take care of such situation."

■ There is evidence in the case from Cohn (a refrigerator dealer), Norton and Tucker (Glenwood's experts) and Money (Artkraft's engineer) from which the jury could find the general standard of performance of other refrigerators with frozen food compartments on the market at the time the contract was made. That standard of performance included, as a minimum, the ability to freeze food and to keep it in frozen storage. There is evidence in the case from the witnesses Norton, Briggs, Newman, Gilson and others from which the jury could have found that the refrigerators supplied by Artkraft to Glenwood, which those witnesses observed in operation, did not meet that standard of performance. The weight and credibility of that evidence was for the jury, which included four women.

Defendant further contends that even if there was an implied warranty of merchantability, the 10–70 model was not required to keep in frozen storage more food than other refrigerators of comparable size. This contention ignores the fact that the 10–70 model was described and sold by Artkraft to Glenwood as a refrigerator having a frozen

food storage capacity of 70 pounds and the 9–52 model as having a frozen food storage capacity of 52 pounds. There was evidence in the case that the 10–70 model would not keep in satisfactory frozen storage the food in the chill tray. It was necessary to include the chill tray in the frozen food storage area in order to store 70 pounds of any ordinary mix of food in the frozen food storage area.

III. At the trial I ruled as a matter of law that Glenwood did not give notice to Artkraft of any breach of the implied warranty of merchantability within a reasonable time after Glenwood knew, or ought to have known, of such breach, and, therefore, that Glenwood was not entitled to recover any damages as a result of such breach. Uniform Sales Act, § 49. But I ruled that such failure to notify did not preclude Glenwood from terminating the contract and recovering the deposits which it had made if the jury found that the refrigerators were not of merchantable quality. Uniform Sales Act, § 45.

■ Defendant contends that the failure of Glenwood to give such notice "likewise precluded plaintiff from rescinding and recovering monies paid on account under the contract sued upon, the same rule being applicable to rescission and recovery of the down payment of money paid on account as is applicable to claims for damages for breaches of express or implied warranties." Defendant relies upon Uniform Sales Act, § 69 (1) (d) and (3), set out in Note 1. Defendant's argument on this point confuses (a) the right to rescind a contract, return the goods delivered and recover the price paid for those goods with (b) the right to terminate an instalment contract with respect to future instalments. At the trial defendant cited many cases dealing with right (a) above. It is undoubtedly true that the right to rescind a sale, return the goods sold and recover the price is barred by failure to notify within a reasonable time. But that is not what Glenwood has been allowed to do in this case.

In this case Glenwood accepted and paid for all of the goods which were delivered, but seeks to terminate the contract with respect to the instalments which were never delivered and to recover the deposits made on account of those future deliveries. This presents a different problem. Williston on Sales (Rev. Ed.) Sec. 467d.

In briefs filed in connection with the motion for judgment n. o. v., counsel for the respective parties for the first time cited cases involving the termination of instalment contracts as distinguished from the rescission of executed sales. The citations included two A.L.R. notes and the three Massachusetts cases discussed below.

A recent annotation, 1953, in 32 A.L.R. 2d 1117, at page 1118, summarizes the law as follows:

"A substantial majority of the cases upon the subject have agreed in holding that an acceptance by the buyer of one or more shipments of goods defective in quality does not, in the absence of circumstances raising an estoppel, amount to a waiver of the defect as to the entire contract, precluding the buyer from rejecting subsequent shipments similarly defective. It is implicit in most of the cases so holding, however, that such an acceptance may preclude the rejection of subsequent shipments of the same quality where the circumstances lead the seller to reasonably believe that goods of the kind delivered will be accepted in the future, and he changes his position to his disadvantage in reliance on such belief.

"The general rule has been applied as to both entire and severable contracts."

The closest case on the facts which I have read is Shotwell-Johnson Co. v. C. O. D. Tractor Co., 154 Minn. 417, 191 N.W. 813. This case supports the rule quoted above.

In Service Inc., v. Goodnow-Pearson Co., 242 Mass. 594, 136 N.E. 623, 626, 29

A.L.R. 1513, the court was dealing with a contract of sale, the goods to be delivered in instalments. The first instalment was defective. The buyer was immediately aware of the defect, notified the seller thereof and stated that it was terminating the contract. Nevertheless, the buyer retained all of the defective goods delivered and used all of the defective goods for the purpose for which they were intended. A second instalment, which evidently was not defective, was refused by the buyer. No further instalments were prepared by the seller. The seller sued the buyer for the full contract price of all instalments. The greater part of the opinion dealt with the buyer's right to rescind the contract with respect to the first instalment which had been delivered and used. The court concluded:

"Because of the acceptance and use of the goods delivered under the first installment, as also because of the absence of a plea of recoupment, the judge rightly found for the plaintiff in the full value under the contract of goods so delivered and accepted, with interest from the date of demand to the date of the writ; leaving to the defendant the right to recover damages for the breach of warranty, in an independent action, if it should be so advised. He was also clearly right in ruling and finding as to the remainder of the deliveries under the contract that the plaintiff was entitled to recover only such damages as it would have suffered if it had done nothing toward carrying out the contract after May 19, taking into consideration the profit which would have been made if the contract had been fully performed."

There was no discussion of the law with respect to the instalments after the first instalment.

In Learned v. Hamburger, 245 Mass. 461, 139 N.E. 641, most of the opinion dealt with points other than the one at issue here. On seller's claim for damages in connection with instalments not manufactured because of buyer's attempted termination of the contract, the lower court had allowed seller only $1 damages, because seller had disposed of those goods without loss. It does not appear that either side took any serious interest in this point on appeal. The opinion lays down no clear rule for our guidance in this case.

The most recent Massachusetts case cited on this point is Agoos Kid Co., Inc., v. Blumenthal Import Corp., 282 Mass. 1, 184 N.E. 279. The court said in 282 Mass. at page 17, 184 N.E. at page 285:

"The defendant contends that the ruling that defects in the goods in the first shipment entitled the plaintiff to refuse to accept and to pay for the second shipment was erroneous, and cites John Service, Inc., v. Goodnow-Pearson Co., 242 Mass. 594, 136 N.E. 623, 625, 29 A.L.R. 1513. The facts in that case are plainly distinguishable from those in the case at bar. In that case the defendant accepted the first shipment and actually used nearly all of it 'for the purpose for which * * * (the goods) were intended' notwithstanding their defective quality, and did so with full knowledge of the plaintiff's breach of warranty and therefore could not rescind the sale. In the present case it was found that 'each shipment * * * (contained) a part of the goods contracted for under the earlier and later contract, and neither shipment * * * (was) composed exclusively of goods under one of these contracts as distinguished from the other.' In these circumstances the plaintiff was justified in assuming that the second shipment contained defective and worthless skins in excess of three per cent of the total number so shipped. In Williston on Sales (2d ed.) at section 467(d) it is said where the vendor 'has already sent a great quantity of inferior goods, the inevitable consequence is that he will not substantially perform the contract even

though all the remaining instalments are what the contract calls for. The buyer should, therefore, be allowed to refuse to go on with the contract unless he has manifested an election to continue by knowingly and voluntarily accepting inferior goods, or otherwise.' Although the plaintiff had an opportunity to inspect all the skins contained in the second shipment, such inspection would not have revealed the defects therein because *it is found that such defects could not have been discovered until the skins had been put in process of manufacture into leather.* It thus appears, as the judge ruled, that failure of the plaintiff to inspect the entire second shipment is not important."

Defendant's position is that Glenwood knew of any defects in the refrigerators (a) at the time it accepted and paid for them, or (b) at any rate by December, 1951, when it made the $40,000 payment on account of future deliveries; and, therefore, by making those payments with that knowledge, Glenwood elected to continue the contract and could not thereafter terminate the contract because of defects in the refrigerators delivered. Glenwood's position is that it did notify Artkraft of the alleged defects within a reasonable time after it knew, or should have known, of the alleged breach of warranty, and that the court erred in finding that it did not; but that in any event such failure to notify did not amount to an election to continue the contract with knowledge of all the facts.

■ My ruling that Glenwood's claim for damages was barred by its failure to notify was based upon my finding, as a matter of law, that Glenwood *should have known* of the alleged defects and breach of warranty long before they gave notice in January, 1952. I did not find that the responsible officers or employees of Glenwood actually knew of these alleged defects at any particular time. After reviewing the evidence, I

do not now find that it appears so clearly that Glenwood knew enough about the alleged defects either when it accepted and paid for the refrigerators which had been delivered to it, or when it made the $40,000 advance early in December, 1951, that I would be justified in ruling as a matter of law that such acceptance and payment or such advance amounted to an election to continue the contract.

At the trial defendant requested a directed verdict in its favor on this point. Defendant did not request that the question whether Glenwood had elected to continue the contract by accepting the refrigerators and making the payments be submitted to the jury. Nor did the defendant except to the charge because I did not submit this question to the jury, or for any other reason except the refusal of its directed verdict prayers.

Nevertheless, I have considered the matter to see whether the failure to submit this question to the jury was clearly erroneous and whether any injustice was done to the defendant.

The applicable authorities seem to make the decision depend upon the equities of the particular case. I do not find from the evidence that Artkraft changed its position to its disadvantage in reliance upon any belief that goods of the kind delivered would be accepted in the future by Glenwood, and defendant did not request that I submit any such issue to the jury.

It is certainly true that in January, 1952, when Glenwood admits that it learned of the alleged defects in the refrigerators, it had not sold to its distributors all of the refrigerators which had been delivered to it by Artkraft, although the evidence indicates that a majority of them had already been sold. It is also true that Glenwood did not offer to return those unsold refrigerators to Artkraft. But I cannot see what Artkraft could possibly have gained by having Glenwood return those refrigerators to it, since (1) Glenwood had paid for them in full, and (2) I have ruled as

a matter of law that Glenwood is not entitled to recover from Artkraft anything for the alleged breach of warranty with respect to those refrigerators because of its delay in notifying Artkraft of the alleged breach of implied warranty.

After careful consideration of the applicable authorities, I conclude that I should not grant a new trial in order that this question might be presented to a jury.

IV. The final point arises out of Glenwood's contention that Artkraft's president offered to permit Glenwood to cancel the contract if it developed that Glenwood could not use or sell all of the refrigerators covered by the contract. This issue was submitted to the jury by Questions 2A and 2B, both of which were answered "Yes" by the jury.

"2A. Did Artkraft's president Morton L. Clark, tell Glenwood's president Walker Leach on or about November 24, 1951, when Clark asked for the advance of $40,000, that if it developed later that Glenwood could not use or sell all of the refrigerators called for by the contract, he (Clark) would cancel the contract?"

"2B. Did Glenwood request or demand that Artkraft cancel the contract pursuant to such agreement?"

Defendant contends that the alleged agreement was not supported by any consideration; or, in the alternative, that if the $40,000 was the consideration, it was entitled to keep the $40,000 if Glenwood cancelled.

Clark telephoned Walker Leach on November 24, 1951, and requested a $40,000 advance against the contract. Walker Leach testified that he said Glenwood would be glad to make the advance but that they would need "some further assurances as to what would be done by Artkraft with relation to the remainder of the refrigerators that had not yet been ordered or shipped. * * * Clark further said that if it developed later that we could not use or could not sell all of the refrigerators that were called for under the contract that he would cancel the contract." Walker Leach gave no answer to the request for $40,000 at that time, but on November 30, 1951, wrote a letter to Clark in which he said: "Rather than making the advance of $40,000 we would prefer to increase it to $50,000 or $60,000, if at the same time we could arrange that that would be the total amount of our liability under the contract." Clark rejected this proposition but called again on December 9. Walker Leach testified that Clark repeated his offer to allow cancellation if Glenwood could not sell or use all of the refrigerators, and that "as a result of that telephone conversation" the $40,000 advance was made by Glenwood. The letter (dated December 11, 1951) enclosing the check read as follows:

"Confirming our conversation of today, we are enclosing our check for $40,000 covering an advance against the uncompleted part of the contract."

Morton Clark testified and denied making any offer to cancel.

Defendant argues that Glenwood's letter of November 30, 1951, quoted above, is inconsistent with such an offer as Walker Leach testified that Clark made. Walker Leach's explanation for that letter is: "I would be willing to pay more money if we could have a formal arrangement of that kind rather than a verbal arrangement."

However unlikely plaintiff's version of the transaction may be, the conflict in the testimony raised an issue of fact to be resolved by the jury. By its answer to Question 2A, the jury found that Clark did make such an offer.

Glenwood and Artkraft had the right to vary the terms of their original agreement by a later agreement, provided such later agreement was supported by a consideration. Defendant argues that there was no such consideration, and cites Marcus v. S. S. Kresge Co., 283 Ill.App. 556, which holds that a contractor cannot enforce a later agree-

ment to pay an additional sum for performing an obligation which the contractor is already bound to perform under the original agreement. It is true that a debtor incurs no legal detriment and a creditor receives no benefit when the debtor pays that which he already owes. But Glenwood did not owe Artkraft $40,000 at the time the payment was made. The purchase price on the refrigerators was not due until the refrigerators were shipped. Therefore, when the $40,000 was paid, it was not yet due. Payment in advance is consideration for modification of an agreement. Very v. Levy, 13 How. 345, 14 L.Ed. 173; Bowlker v. Childs, 3 Allen, Mass., 434; Chicora Fertilizer Co. v. Dunan, 91 Md. 144, 46 A. 347, 50 L.R.A. 401.

Defendant further contends that if the $40,000 is returned, defendant is deprived of any possible consideration which might support the agreement. However, defendant's use of the $40,000 during the period between its receipt and its return is sufficient, if slight, consideration for the agreement. The value of this consideration has bearing on the likelihood of such an agreement having been made. But since the jury has found that the agreement was made, the court must hold that the use of the $40,000 constitutes legal consideration.

In answer to Question 2B, the jury found that Glenwood requested or demanded that Artkraft cancel the contract pursuant to such an agreement. There is no legally sufficient evidence to support such a finding. But it was not necessary that Glenwood refer to the agreement in the exercise of the right to cancel which it had under the agreement.

The agreement, as established by the jury's finding, was that Glenwood would be released from the contract "if it developed later that Glenwood could not use or sell all of the refrigerators called for by the contract". There is ample evidence tending to establish that, for whatever reason, Glenwood could not use or sell all the refrigerators.

A party does not lose its right to cancel by giving insufficient grounds therefor unless the circumstances are such as to create an estoppel. Moss v. Old Colony Trust Co., 246 Mass. 139, 140 N.E. 803; Price v. Rosenberg, 200 Mass. 36, 85 N.E. 887. Cf. Restatement of Contracts, Sec. 304. There is no evidence of an estoppel in this case. See Harman & Co. v. William Filene's Sons Co., 232 Mass. 52, 55, 121 N.E. 504. Therefore, plaintiff's failure to claim that its cancellation was under the agreement giving that right is not a bar to plaintiff's claim at this time.

Nor is plaintiff's right to make this claim barred by the fact that it was not pleaded in the complaint. Rule 15 (b), Fed.Rules Civ.Proc. 28 U.S.C.A.; 3 Moore's Federal Practice (2d Ed.) p. 845. Defendant's counsel made no objection to the admission of the testimony of Walker Leach concerning his oral agreement with Clark, but cross-examined Walker Leach about that agreement, and a week later, when Clark was on the stand, questioned him about it. Defendant, therefore, gave its implied consent to the submission of this issue to the jury. Rule 15(b), Fed. Rules Civ.Proc.; Moore, p. 847; Shelley v. Union Oil Co., 9 Cir., 203 F.2d 808; Fireside Marshmallow Co. v. Frank Quinlan Const. Co., 8 Cir., 199 F.2d 511.

The claimed agreement was referred to in plaintiff's answers to interrogatories filed long before the trial. Defendant did not claim surprise and did not ask for a continuance.

The motions for judgment n. o. v. and for a new trial are denied.