BEIT BROS., INCORPORATED, *vs.* IRVING TANNING COMPANY.

Suffolk.    January 26, 1944. — February 29, 1944.

Present: FIELD, C.J., LUMMUS, DOLAN, RONAN, & WILKINS, JJ.

*Sale,* Contract of sale.   *Contract,* What constitutes.   *Agency,* Scope of authority or employment.   *Practice, Civil,* Ordering verdict, Variance.

Although the evidence at the trial of an action did not support a cause of action for goods sold and delivered set out in the declaration, an exception by the defendant to the denial of a motion for a directed verdict, not based specifically on the pleadings, was not sustained since the evidence warranted a verdict for the plaintiff for breach of the contract of sale by the defendant's failure to take the goods and pay for them.

Evidence warranted a finding that, after the making of a written contract of sale, a shipment by the seller of goods substantially different in quantity, quality and price from those called for by the contract and a promise made by the buyer to the seller to take the goods shipped constituted a new contract which the buyer broke by subsequently failing to take and pay for them.

A hide broker representing both parties in conducting a transaction including a contract of sale, upon the seller's shipping goods substantially different from those called for by the contract could be found to have authority from the seller to receive a binding promise by the buyer to take the goods so shipped.

CONTRACT.   Writ in the Superior Court dated May 9, 1940.

The defendant alleged exceptions saved at a trial before *Buttrick*, J. In this court the case was submitted on briefs.

S. *Pearl & F. G. Moulton*, for the defendant.

E. M. *Dangel & L. E. Sherry*, for the plaintiff.

WILKINS, J. This is an action of contract arising out of the nonacceptance of a carload of hides. There was a verdict for the plaintiff, and the only question presented is the correctness of the refusal of the trial judge to direct a verdict for the defendant.

The following facts were not in question: On December 14, 1939, by a written contract entered into through one Isaacson, a hide broker representing both parties, the plaintiff agreed to sell, and the defendant agreed to buy, "One carload, estimated about 8/900 allweight hides. . . . Allweights, average, estimated about 44/45 lbs., all new standard trimmed, and all fresh current receipts." "About 8/900" meant about eight to nine hundred. "All new standard trimmed" called for hides with the ears, snouts, and tails removed. "All fresh current receipts" referred to fresh hides. The price was "13¢ per lb. flat for the Number ones and twos, any Number threes or Bulls, one third less." Shipment was to be "after Jan. 1st, 1940, to The Irving Tanning Co., Hartland, Maine," and the terms were "Invoice, Order Bill of Lading attached to Sight Draft, drawn on The Irving Tanning Co., through the Warren National Bank, at Peabody, Mass." Isaacson, according to trade practice, was to receive a commission, in this instance one per cent of the total invoice, from the seller, and also a commission, in this case seven cents per hide, from the buyer, for receiving, which included seeing that the skins were banked overnight to secure dry weight and being present when they were shaken free of salt, weighed, and loaded in the freight car. On January 16, 1940, the plaintiff shipped from Norwich, Connecticut, to Hartland, Maine, a carload consisting of seven hundred thirty-four trimmed and two hundred seventeen untrimmed hides. The bill of lading was filled out "Consigned to order of Beit Bros. Inc. Destination Hartland . . . Notify Irving Tanning Co." and had attached to it the original invoice and a

sight draft dated January 8, 1940, drawn on the defendant in the sum of $5,559.40. These were forwarded through a Norwich bank to the defendant's bank in Peabody. A copy of the original invoice dated January 6 was sent to and received by the defendant's office in Boston. This showed in some detail the number, weight, description, and prices, the untrimmed hides being billed at a slightly lower price per pound than the trimmed hides. The car remained unloaded on the tracks at Hartland from January 20 until April 27, when the hides were resold by the plaintiff, without notice to the defendant, at the prevailing market price through the same broker to another buyer.

The ad damnum of the writ was $3,000, and the one count remaining in the declaration when the case was submitted to the jury was for $5,559.40 for goods sold and delivered. The verdict was for $2,030.54. This was the sum which the judge in his charge instructed the jury should be the damages in the event they should find for the plaintiff, and was based upon the difference between the contract price and the resale price, plus freight, demurrage charges, and interest. No question was raised about this amount.

The defendant's motion for a directed verdict was not based specifically upon the pleadings. Consequently, an exception will not be sustained to a denial of the motion if the evidence justifies a finding for the plaintiff in any amount. *Weiner* v. *D. A. Schulte, Inc.* 275 Mass. 379, 385. *Earle C. Dodds Inc.* v. *Boston Casualty Co.* 308 Mass. 124, 127. *Botti* v. *Venice Grocery Co.* 309 Mass. 450, 458.

The shipment palpably did not comply with the terms of the written contract. If matters rested there, the plaintiff could not recover. See *Rommel* v. *Wingate,* 103 Mass. 327; *Agoos Kid Co. Inc.* v. *Blumenthal Import Corp.* 282 Mass. 1, 7; *Ryder & Brown Co.* v. *E. Lissberger Co.* 300 Mass. 438, 444; G. L. (Ter. Ed.) c. 106, § 16.

On the evidence most favorable to the plaintiff, however, it could have been found that after the defendant learned the details as to the contents of the car, including the respective prices of the various kinds of trimmed and untrimmed hides, it made a new agreement to take them.

From conflicting testimony the following could have been believed: About January 18 or 20 Kirstein, president and treasurer of the defendant and "virtually the owner of the defendant business," had a conversation with Isaacson, who asked the reason for not paying the draft. Kirstein replied that he had been away and was a little pressed for funds; that Robbins, the office manager and head bookkeeper at the defendant's office in Boston and "in charge of the office affairs" during the absence of Kirstein, had informed him there was something wrong with the invoice, but that Kirstein did not then have time to look into it and would see Isaacson later. Sometime in February Isaacson again saw Kirstein, who said he noticed the invoice had some untrimmed hides in it, and asked what Isaacson was going to do about it. The latter told him that if he would look at the invoice, he would see ample allowance had been made to take care of the trimming. At first Kirstein said that he did not think it was enough and that he did not think he was going to take the hides. After some further talk Isaacson said that Kirstein had bought the hides fair and square, that he had put them up to the best of his ability, that he had coaxed Beit Bros., Incorporated, to sell Kirstein the hides, that he had confidence in them and would like Kirstein to take the hides without question. Kirstein replied, "Well, if that's the way you feel about it, and it will help you, we will take delivery of the hides." About the first of March Isaacson again saw Kirstein, who said he had figured the loss from trimming would amount to several hundred dollars, and he did not feel he should take the hides. Isaacson told him if he would take them that week, he would see that he got an allowance of the freight, even if it came out of Isaacson. Kirstein replied, "Well, that is all right. We will take the hides in a week or so." In the meantime Samuel J. Beit, general manager of the plaintiff, had numerous telephone conversations with Robbins in the absence of Kirstein. These took place on January 23, February 1, 5, 8, 13, 16, and on an average of once a week until March. Each time Robbins said in substance that they would be delayed a few days because they could not take up the draft

right away, and that they were going to take the merchandise. Early in March Samuel J. Beit saw Robbins at the defendant's Boston office. "He said Mr. Kirstein was away on a business trip, and not expected back for some time, but he was quite sure that when Mr. Kirstein did come back he would be able to handle the car of hides then financially and he was sure he would take care of it." After another unsuccessful effort to see Kirstein, on April 4 Samuel J. Beit accompanied by Max Beit, treasurer of the plaintiff, saw Kirstein in his office. The latter said that he was rather handicapped and could not do much for them. "It seemed as though perhaps he was trying to get an arrangement of some kind." He asked if they "could release the hides, not on full payment at that time, but payment and then notes, and he would take it immediately under those conditions." Max Beit rejected the suggestion and told him the plaintiff would have to have its money at once. Kirstein took them through his stock room and "showed the large stocks he had, and explained that due to large inventory he was really handicapped, and upon receipt of funds he would do the best he could. . . . He thought he would have money by the 20th." The plaintiff's representatives told him they expected immediate payment and would collect immediately if possible. Kirstein said that "he couldn't afford to take up the hides immediately, and that . . . [they] should have patience and wait some more." The representatives of the plaintiff threatened to bring suit and put in a keeper if immediate payment were not made. Kirstein said "if that was the case, he wasn't with . . . [them] in the first place and . . . [they] could do as . . . [they] pleased. . . . Max Beit explained that they had waited four months. Mr. Kirstein explained that Beit Bros. were not the only ones waiting and he had other cars in before . . . [theirs]." Throughout this conversation Kirstein made no complaint that some of the hides were untrimmed. Nathan Beit, president of the plaintiff, called the defendant on the telephone "dozens of times," as often as twice a week. He used to put in the calls for Kirstein, but always got Robbins, who invariably told him Kirstein was away in New York

looking for money, and he was positive in two days the hides would be accepted. Robbins never found any fault with the shipment. The defendant continually advised the Maine Central Railroad the car would be unloaded, and Kirstein knew it. At one time the defendant told the bank the draft would be paid.

This decision does not rest upon acceptance of the goods under G. L. (Ter. Ed.) c. 106, § 37, although this seems to have been the theory of the judge's charge, to which, however, no exceptions were taken. The shipment of the car containing hides of different quantity and some of different quality and at different prices than specified in the original contract constituted an offer of a new contract, the subject matter to be the contents of the car and the buyer's undertaking to be payment of the total of the amounts set forth in the invoice by accepting the draft and taking up the bill of lading within the time expressly stated, otherwise within a reasonable time. *Lowry Coffee Co.* v. *Andresen-Ryan Coffee Co.* 153 Minn. 498, 500. Williston on Sales (2d ed.) § 278. 46 Am. Jur. Sales, § 49. G. L. (Ter. Ed.) c. 106, § 40. This offer could be found to have been accepted by the defendant in either of the two conversations of Isaacson and Kirstein. *Hanson & Parker, Ltd.* v. *Wittenberg*, 205 Mass. 319, 326–327. Isaacson, the broker who had shipped the car with the plaintiff's authority, could receive a binding promise from the defendant to take the new car. "Unless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." Am. Law Inst. Restatement: Agency, § 35. *Sprague* v. *Gillett*, 9 Met. 91, 92.

It is not necessary to determine whether the offer could be found to have been accepted by Robbins in any of his conversations with Samuel J. Beit or Nathan Beit, or whether Robbins, who was in charge of office affairs during the absence of Kirstein, at such times had authority to bind the defendant in that respect. See *Houghton & Dutton Co.* v. *Journal Engraving Co.* 241 Mass. 541, 543–544; *Gerrish Dredging Co.* v. *Bethlehem Shipbuilding Corp. Ltd.*

247 Mass. 162, 167; *Gibson* v. *Contract Water Proofing Co.* 277 Mass. 455, 458–459.

The defendant contends that no change in the original contract of sale may be found, because the parties were throughout still in the negotiation stage. This could not on the evidence be so ruled as a matter of law.

No question of the statute of frauds has been raised or considered.

*Exceptions overruled.*