**Christopher M. CAPPELLINI,
et al., Plaintiffs,**

v.

**MELLON MORTGAGE COMPANY,
Defendant.**

**Civil Action No. 96–CV11413–DPW.**

United States District Court,
D. Massachusetts.

Oct. 27, 1997.

Revised and Expanded Jan. 15, 1998.

Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, Edelman & Combs, Chicago, IL, John Roddy, Grant & Roddy, Boston, MA, Edward K. O'Brien, O'Brien Law Firm, Nashua, NH, for Plaintiffs.

Anthony M. Feeherry, Howard J. Hirsch, Victoria C. DeMaret, Goodwin, Procter & Hoar, Boston, MA, for Defendant.

## MEMORANDUM

WOODLOCK, District Judge.

The advent of various forms of electronic technology has provided a range of opportunities to increase office efficiency and profitability. One parallel development has been the tendency of service providers to shift the costs of their office operations to others by means of user fees associated with the new technology.

In this case an individual, seeking to refinance the house he owns jointly with his wife, paid fees totaling $40 dollars for facsimile reproductions of payoff reports from the servicing company for their prior mortgage. The charges were passed through to him by the closing attorney, selected by the new lender, who ordered the reports. This litigation involved a challenge to the imposition by the servicing company of fees of that type.

By a Memorandum and Order entered October 27, 1997, I disposed of cross motions for summary judgment seeking to determine at the threshold of this litigation the propriety of such fees. I had framed the threshold issues, by means of scheduling orders, as whether a payoff report fee is either 1) a prepayment charge, expressly prohibited by the note, or 2) a charge not expressly authorized by either the note or the mortgage and therefore not permitted.

I found that, while the charges evidence a degree of low-grade avarice [1] on the part of the servicing company in the nickel and diming of consumers,[2] as a general proposition the fees at issue here are neither illegal nor in breach of contract. The manner of the

---

1. The separate fees extracted from individual consumers are not large. As to the plaintiff here, the fees amounted to only $40. In the aggregate, however, such fax and statement fees provide considerable income to the servicing company. Since July 1990, Mellon Mortgage Company has collected approximately $2.9 million in "fax fees" and $800,000 in "statement fees." (Def.'s Resp. to Interrog. 3.)

2. A rough comparison of the reasonableness of facsimile fees charged here separately from general overhead can be made by examining the practices of the courts regarding reimbursement for such fees as expenses in litigation.

The Manual for Complex Litigation (3d ed.1995) observes that:

Rules and practices vary widely with respect to reimbursement of expenses incurred by lawyers in the course of the case out of a fee award. Charges for paralegals and law clerks at market rates and the fees of necessary experts are generally reimbursable. Secretarial assistance, on the other hand, is a normal part of overhead, but courts have differed over whether overtime is reimbursable. Similarly, rulings vary on such items as copy and printing costs, certain meals and travel, and fax telephone, and delivery charges.

§ 24.215, *quoted in In re San Juan Dupont Plaza Hotel Fire Litigation*, 111 F.3d 220, 231 n. 10 (1st Cir.1997).

A number of courts have found fax costs to be part of overhead, rather than litigation costs, and as such, unrecoverable. *See, e.g., Embotelladora Agral Regiomontana S.A. de C.V. v. Sharp Capital, Inc.*, 952 F.Supp. 415, 417 (N.D.Tex.1997) (citations omitted); *Commodity Futures Trading Commission v. Richards*, 1996 WL 515160 at *2 (N.D.Ill.1996) (fax charges not recoverable because considered to be incorporated into attorney's hourly charge under Illinois law); *Cody v. Private Agencies Collaborating Together, Inc.*, 911 F.Supp. 1, 6 (D.D.C.1995).

Other courts, however, have been willing to approve fax charges in fee petitions when the fax was reasonably necessary and only the actual, reasonable amount for transmission was charged. *See, e.g., Massachusetts Department of Public Health v. School Committee of Tewksbury*, 841 F.Supp. 449, 462 (D.Mass.1993); *In re Abbott Laboratories Omniflox Products Liability Litigation*, 1997 WL 162891 at *2 (N.D.Ill.1997); *1st Westco Corp. v. School District of Philadelphia*, 1994 WL 18632 at *7 (E.D.Pa.1994). One district court has observed that reasonable expenses of the " 'sort that lawyers ordinarily include in their bills to clients, are recoverable as part of the reasonable attorneys' fee ordinarily awarded

imposition of these charges on the named plaintiff individually, however, raised a genuine issue of material fact preventing the full grant of defendant's motion for summary judgment. Nevertheless, because the remaining amount in controversy—$40—created a question about continuing federal jurisdiction of this matter, I invited the parties to brief whether the case should continue to be litigated in federal court. When the defendant thereupon moved to dismiss the case, the plaintiff did not oppose and after further hearing I allowed the motion to dismiss, finding no viable federal jurisdiction for the dispute after resolution of the threshold issues.[3] This Memorandum, a revised and expanded version of that issued on October 27, 1997, is designed to provide a full explication of the disposition of the case in this Court.

## I. BACKGROUND

### A. *The Mortgage and the Note*

On September 23, 1994, the plaintiff, Christopher Cappellini, and his wife Traci obtained a mortgage loan from Equity One Mortgage, Inc. Equity One then immediately sold the Note and Mortgage to the Huntington Mortgage Company. Huntington sold the Note and Mortgage to the defendant, Mellon Mortgage Company, on March 2, 1995.

The Note was written on a standard Federal National Mortgage Association ("FNMA")/Federal Home Loan Mortgage Corporation ("FHLMC") form. Paragraph 4 of the form Note, entitled Borrower's Right to Prepay, states:

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

*I may make a full prepayment or partial prepayments without paying any prepayment charge.* The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under the Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

(emphasis added.)

The Mortgage is also on a standard FNMA/FHLMC form and contains language

---

to prevailing plaintiffs in ADEA cases' " and on that basis found fax fees to be recoverable as costs. *Ryther v. KARE 11*, 864 F.Supp. 1525, 1533–34 (D.Minn.1994) (*quoting Neufeld v. Searle Laboratories*, 884 F.2d 335, 342 (8th Cir.1989) (citations omitted)).

In bankruptcy proceedings—under the guidance of Section 330(a)(1)(B) of the Bankruptcy Code which provides for "reimbursement for actual, necessary expenses"—a "great majority of bankruptcy court decisions to date have allowed telecopying charges subject to a showing of actual costs and necessity as indicated." *See In re New Hampshire Electric Cooperative, Inc.*, 146 B.R. 890, 899 (Bankr.D.N.H.1992) and cases cited therein. For example, in 1993, one Bankruptcy Court allowed fax charges at a rate of $0.15 per page plus the cost of the outgoing telephone call as reasonable. *In re 321 South Main Street, L.P.*, 155 B.R. 41, 43 (Bankr.D.R.I.1993). When the party applying for costs does not state with specificity how the charges are calculated (by providing the cost per page and the cost for the phone call), or attempts to generate profits by charging excessive amounts for transmissions, bankruptcy courts have disallowed such charges. *See In re de Weldon*, 176 B.R. 665 (Bankr.D.R.I. 1995); *In re Boulders on the River, Inc.*, 169 B.R. 969, 983 (Bankr.D.Or.1994).

It is unlikely that a fax fee of $15.00 would be treated as reasonable even by those courts which allow the specific recovery of fax fees separate from law office overhead.

**3.** This case was filed as a class action by the plaintiff on behalf of all individuals charged the fees to which plaintiff objects whose loans were serviced by defendant and had notes or mortgages with language similar to that on plaintiff's note and mortgage. The parties agreed, however, that motions for summary judgment on the threshold issue of the propriety *vel non* of the fees would be filed and resolved before class certification was addressed.

The choice of the class action vehicle for this litigation is an example of another opportunity modern developments have generated. The fact that a $40 case involving interpretation of a note and mortgage could find its way into the federal courts was a result of the styling of the complaint as a putative class action invoking federal jurisdiction under the RICO statute, 18 U.S.C. § 1962(c). Through this mechanism, plaintiff's counsel sought here to aggregate an amalgam of small claims matters before a federal court, in an apparent hope to create and sustain a claim of sufficient mass to provide economic opportunities substantial enough for members of the bar to pursue.

authorizing certain charges. For example, Paragraph 4 of the Mortgage, entitled Charges; Liens, states in part:

> Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any.

Other charges or fees for which the borrower is responsible and which are specifically referenced in the Mortgage include obligations to pay principal and interest in accordance with the Note, to pay late charges, to pay tax and insurance escrows, to pay charges related to outstanding security interests on the property, to pay for hazard insurance on the property, to pay for repair and maintenance of the property, to pay for mortgage insurance, to pay for condemnation or taking of the property, and to pay all costs of recordation of the discharge releasing the mortgage. In addition, Paragraph 22 of the Mortgage contains a provision which states:

> Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

### B. *The Refinancing*

In 1996, the Cappellinis decided to refinance the Mellon Loan with a new lender. James Paolino was the closing attorney for the new lender. The Cappellinis provided Paolino, through the new lender, with the loan number and related information in order to obtain payoff numbers from Mellon.

On March 1, 1996, five days before the scheduled closing on the new loan, Donna Medeiros, an employee in Paolino's office called Mellon and ordered a faxed payoff statement from Mellon's Voice Response Unit ("VRU"). On March 5, 1996, another faxed payoff statement was ordered from Mellon's VRU by Medeiros. Mellon faxed the requested payoff statements to Paolino's office.

Mellon charged the Cappellinis a $15 "fax fee" and a $25 "duplicate statement fee" for these services. These fees appeared on the March 5, 1996 payoff statement as a "fax fee"

and a "statement fee." These fees are not among those charges specifically enumerated in the Note or Mortgage.

Before the closing, but after he had seen the March 5, 1996 statement including the fax and statement fees, Cappellini called the Mellon customer service number. Cappellini inquired about these fees and was told that the fees "were charged by Mellon Mortgage for the purposes of obtaining this information to make a payoff." Cappellini never asked Mellon to waive or remove these fees.

After the closing on the new loan, the Cappellinis paid Mellon the full balance of principal and interest due on their loan, as well as the $15 fax fee and the $25 duplicate statement fee.

### C. *Mellon Policies*

Mellon services residential mortgage loans throughout the country. Mellon has servicing centers in Denver, Colorado, Houston, Texas and Overland Park, Kansas. The Cappellinis' mortgage was serviced out of the Houston center. Mellon, as a loan servicer, provides administrative and record-keeping services, including collecting loan payments from borrowers, paying property taxes and property insurance, maintaining the borrower's escrow account, and providing the borrower with annual account statements.

Mellon will prepare written payoff statements for borrowers or their agents at their request. Mellon does not charge for statement fees mailed to a borrower, but does charge for statements to be faxed to a borrower. Mellon currently charges between $10 and $15 for faxing a statement on a conventional mortgage and $5 for faxing a statement on a Federal Housing Authority ("FHA") loan. This charge is called a "fax fee" on the payoff statement. The Houston and Denver Servicing Centers charge a $25 duplicate statement fee for any payoff statement requested within 90 days of a first request. On the payoff statement, this fee is referred to as a "statement fee."

A borrower may prepay a loan in part or in full without obtaining a payoff statement, although most borrowers do obtain such a written statement, especially when refinanc-

ing, because one is often required by the new lender before closing. A borrower may remain liable for fax or statement fees even if a loan is not prepaid at the time the fees are incurred. According to its Payoff Department Manager, Mellon will discharge a note whenever principal and interest are paid in full, even if the fees are not paid. However, this "policy" is not set out in any documents made available to borrowers, and was unknown to the plaintiff.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (citations omitted).

## III. ARE THE MELLON FEES EXPRESSLY PROHIBITED AS PREPAYMENT CHARGES?

### A. *History of Prepayment Charges*

■ The term "prepayment charge" as used in Paragraph 4 of the Note is not defined in that document or in the accompanying Mortgage. The parties have offered dictionary definitions of "prepayment charges" or "prepayment penalties." For example, Black's Law Dictionary (6th ed.1990) defines the term "prepayment penalty" as a "penalty under a note, mortgage, or deed of trust, imposed when the loan is paid before its due date. Consideration to terminate a loan at borrower's election before maturity." To understand whether or not the charges plaintiff complains of are in fact prepayment

charges, however, a page of history is more valuable than lexigraphic logic.

Historically, a borrower was not permitted to prepay a loan. When practices changed to allow borrowers to prepay loans in part or full, prepayment penalties or charges were developed in order to compensate lenders for costs associated with the unanticipated reinvestment of principal, presumptively at less favorable rates. These charges deterred borrowers from prepaying and afforded lenders more predictable returns during periods of fluctuating interest rates. These prepayment charges were usually calculated in relation to the amount and timing of prepayment.

The practices of pooling mortgages through a secondary mortgage market and offering adjustable rate mortgages diminished the use of prepayment penalties. FNMA and FHLMC, in order to avoid possible conflicts with a number of state laws which prohibited or limited prepayment charges, led a movement to standardize the secondary mortgage market and refused to purchase mortgages which authorized prepayment charges.

### B. *Judicial Treatment of Prepayment Charges*

■ In *Goldman v. First Federal Savings and Loan Association*, 518 F.2d 1247, 1249 n. 1 (7th Cir.1975) (quoting 12 C.F.R. § 545.6–12(b)), the Seventh Circuit established a test for determining whether a charge for prepaid interest constitutes a prepayment penalty under a federal regulation allowing borrowers " 'the right to prepay their loans without penalty unless the loan contract makes express provision for a prepayment penalty.' " Then–Judge Stevens writing for the Seventh Circuit held that "the mere fact that some cost is imposed on the borrower at the time the loan is prepaid does not warrant the conclusion that such cost is a penalty.... The proper test ... is whether there is a charge imposed at the time of prepayment that would not be imposed if the note were paid at maturity instead of at an earlier date." *Id.* at 1252. The Seventh Circuit additionally noted that the nature of the charge, rather than the amount at issue was the appropriate focus of the test. *Id. See also Burris v. First Financial Corp.*, 928

F.2d 797, 804 (8th Cir.) ("acquisition charge" due on prepayment is not prepayment penalty but rather a "handling fee" covering costs associated with releasing the loan), *cert. denied,* 502 U.S. 867, 112 S.Ct. 195, 116 L.Ed.2d 155 (1991); *Currie v. Diamond Mortgage Corp. of Illinois,* 859 F.2d 1538, 1541 (7th Cir.1988) (points which "must be paid regardless of whether the loan is prepaid" are not prepayment penalties); *Schmidt v. Interstate Federal Savings & Loan Ass'n,* 421 F.Supp. 1016, 1018 (D.D.C. 1976) (prepayment charge and additional interest payments are prepayment penalties because they would not have been incurred if loan was paid at maturity).

There is little case law on the specific question whether charges for duplicate statements or the faxing of statements constitute prepayment charges under *Goldman* or any other test. Plaintiff contends that the district court in *Sandlin v. Shapiro & Fishman,* 919 F.Supp. 1564 (M.D.Fla.1996), held "an identical payoff statement fee to be a prepayment charge." (Pl.'s Memo. at 13 .) In *Sandlin,* the plaintiffs defaulted on their note, which contained language identical to that in Paragraph 4 of Cappellini's Note, and the lender hired the defendants to collect on the note and mortgage. The defendants sent the borrowers a letter that included a payoff figure, which had a $60.00 "payoff fee" added to the final figure. The letter also advised the Sandlins that in the future, an additional $50.00 charge would be imposed for generating each payoff statement. The district court denied the defendants' motion to dismiss, stating that the $60.00 "payoff fee" was prohibited by the language in the note allowing prepayment without incurring prepayment charges. *Id.* at 1569. Contrary to Cappellini's argument, however, the district court did not hold that the defendants breached the provision by charging for providing the payoff figure itself. The district court addressed under the no payoff charge clause only the $60.00 "payoff fee" that the debt collectors charged, but not the potential $50.00 charge to provide additional payoff statements.

For its part, Mellon submitted with its moving papers a copy of an unpublished Illinois trial court judgment holding that servicing fees are not prepayment charges or penalties. *See Rumford v. Countrywide Funding Corp.,* No. 95–CH–668, Circuit Court for the Nineteenth Judicial Circuit, Lake County, Illinois (June 26, 1996). After the hearing on the motion in this case, the trial court's grant of summary judgment in *Rumford* on the issue of prepayment charges was reversed on appeal. *Rumford v. Countrywide Funding, Inc.,* 287 Ill. App.3d 330, 331, 222 Ill.Dec. 757, 678 N.E.2d 369 (1997). The appellate court determined that there were triable issues of fact regarding whether the fees assessed were in fact servicing fees, as claimed by the defendant lender, or prepayment penalties as indicated on the account statement. *Id.* at 335, 222 Ill.Dec. 757, 678 N.E.2d 369. Thus, unlike the circumstances here, the list of charges that the plaintiff received in *Rumford* included items referred to as "prepayment penalties", although the defendant in affidavits claimed these "prepayment penalties" were in fact fax and statement fees. *Id.* at 333, 222 Ill.Dec. 757, 678 N.E.2d 369. The discrepancy between the defendant's affidavits and the account statement provided to the plaintiff created an issue of fact for the appellate court in *Rumford. Id.* at 335–36, 222 Ill.Dec. 757, 678 N.E.2d 369. Such a discrepancy did not exist here because the payoff statement provided to Cappellini referred to the charges as "statement fee" and "facsimile fee."

Mellon also submitted a Memorandum Opinion from the trial court in New York State issued after the hearing on the summary judgment motions in this matter granting summary judgment against a claim that fees for faxing a payoff statement constituted an improper discharge fee under the standard FNMA/FHLMC form mortgage contract. *Westfall v. Chase Lincoln First Bank, N.A.,* No. 113777196 (Supreme Court of the State of New York, County of New York) (Oct. 3, 1997). The *Westfall* court held, in the context of a New York consumer protection statute, that "[n]o reasonable consumer could be mislead that this fax fee was really a fee required to discharge the mortgage, and not a fee for the extra service of having the payoff statement faxed to them." *Id.* at 7.

## C. The Instant Charges

■ Under a conventional test or definition, the fax and statement fees in this case are not prepayment penalties or charges. Prepayment charges are those which are peculiarly associated with prepayment alone. Here, although plaintiff requested these statements by fax in relation to the prepayment of his loan,[4] the charges were not incurred in connection with prepayment alone.

The fax and statement fees here may be incurred in situations unrelated to prepayment, such as updating personal records, preparing personal financial statements or evaluating refinancing possibilities. A borrower may also prepay a loan without obtaining a payoff statement. Moreover, a borrower can obtain one payoff statement by mail free of charge, but Mellon charges a fee for a faxed payoff statement and for a second statement requested within 90 days of the first.

Plaintiff argues that it is customary for payoff statements to be obtained prior to prepaying a loan through refinancing and that industry practice now favors having that payoff statement faxed. This does not, however, mean that a payoff statement is required in order to prepay a loan, or that a payoff statement must be faxed in order to prepay a loan.[5] Similarly, this argument does not affect the fact that these charges could readily be incurred even if the loan was paid at maturity.

The fax and statement fees are not prepayment charges, but are rather charges for special services outside of the basic service agreement provided to the borrower by Mellon with respect to—but not exclusively related to the prepayment of—a loan.[6] Simply because a fee is incurred during the prepayment of the loan does not necessarily make it a prepayment charge or penalty for prepaying the loan. The charges at issue here may be incurred in the process of prepaying a loan, but they need not be and may in fact be incurred in relation to activity unrelated to prepayment of a loan, thus taking them out of the realm of the prohibited "prepayment charges" language contained in the plaintiff's Note.

## IV. ARE THE MELLON FEES BARRED BY THE PARTIES' CONTRACTS?

### A. Enumerated v. Non–Enumerated Fees

■ The plaintiff argues that because the Note and Mortgage, both form instruments, expressly authorize certain charges but not

4. Cappellini argues that Paolino was not his agent for receiving the faxed payoff statements. Under Massachusetts law, "[u]nless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." *Beit Brothers v. Irving Tanning Co.*, 315 Mass. 561, 566, 53 N.E.2d 702 (1944) (citations omitted). It is clear that Cappellini authorized, through the new lender, Paolino's activities in relation to the closing, which necessarily included obtaining the payoff statements in whatever method Paolino felt necessary. Therefore, although it was Paolino's employee who actually requested the faxed statements, I treat the request for faxed statements as that of Cappellini.

5. Cappellini claims that under the Statute of Frauds he could not have prepaid his loan without obtaining a written payoff statement. I did not address whether that claim was an accurate statement of law because it does not affect my analysis. It was undisputed that Cappellini could have obtained a written payoff statement by first class U.S. mail at no charge. That he chose to obtain it by fax did not change the fact that it would have been possible for him to have paid off the loan without incurring the fax or duplicate statement fees.

6. Cappellini states that the fees at issue here were not imposed for services rendered for the borrower, as opposed to the lender. While it is true that mortgage servicers generally perform services for the lender and collect fees for performing those services, it is not true that Mellon here provided the multiple faxed payoff statements in order to collect fees for itself or in order to perform a service for the lender. It was Cappellini who wished to take advantage of the lower interest rates and refinance his mortgage. It was the closing attorney chosen by Cappellini's new lender who requested the multiple faxed copies for his convenience and reassurance so that Cappellini could close on the second loan. It was of no particular benefit to either the original lender or the mortgage servicer to have Cappellini refinance and pay off the first loan. Therefore it is clear that in issuing two copies of the payoff statement by fax to Paolino, Mellon was indeed providing a service to Cappellini, albeit at a profit to itself.

those specifically imposed by Mellon in this case, general canons of contract interpretation require that I find these non-enumerated fees unauthorized under the contracts. The parties engage in explication of Latin maxims as bases for developing the issues.

■ The plaintiff resorts to the maxim *expressio unius exclusio alterius* ("mention of one thing excludes another"). This maxim "instructs that, when parties list specific items in a document, any item not so listed is typically thought to be excluded." *Smart v. Gillette Co. Long–Term Disability Plan*, 70 F.3d 173, 179 (1st Cir.1995) (citation omitted). The plaintiff contends that because the charges at issue here were not expressly permitted they should be considered prohibited. The maxim, however, "is not always dispositive," *id.*, and is considered to be "an aid to construction and not an inflexible rule." *Hewlett–Packard Co., Inc. v. Berg*, 61 F.3d 101, 106 (1st Cir.1995) (citation omitted).

The plaintiff also contends that the contracts, under the rule of *contra proferentum* and other basic principles of contract interpretation, must be construed against the drafter, in this case Mellon, particularly since the Note and Mortgage are uniform contracts. The term adhesion contract is "a handy shorthand descriptive of standard form printed contracts prepared by one party and submitted to the other on a 'take it or leave it' basis." *Standard Oil Co. of California v. Perkins*, 347 F.2d 379, 383 n. 5 (9th Cir.1965) (citations omitted). The common-law rules of contract interpretation state that "a court should construe *ambiguous* language against the interest of the party that drafted it." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62, 115 S.Ct. 1212, 1219, 131 L.Ed.2d 76 (1995) (emphasis added); *see also Rams v. Royal Caribbean Cruise Lines, Inc.*, 17 F.3d 11, 13 (1st Cir. 1994). The rationale behind this rule is to "protect the party who did not choose the language from an unintended or unfair result." *Id.*

Following these general rules of contract interpretation, I nevertheless find that plaintiff's argument fails to demonstrate that the charges at issue here are barred by the contracts. The plaintiff's Note and Mortgage do mention some specific charges, including principal, interest, late and default charges, as well as tax, insurance and recordation costs. The plaintiff argues that no charges apart from these are ever allowed. The Note and Mortgage, however, also make specific mention of charges which Mellon cannot impose, including prepayment charges and charges for holding and applying escrow funds. Mellon counters that under the maxim of *expressio unius* to which the plaintiff resorts, those fees not specifically barred by the contracts are, by implication, authorized.

Neither one of the positions held by the parties is persuasive as support for a blanket permission or ban on charges not enumerated in the contracts. The charges expressly mentioned in the Note and Mortgage appear to be of a class which are related either to payments under the agreements or to default by the borrower. Charges in a similar category not stated in the contracts might be barred by the *expressio unius* principles, but fax and duplicate statement fees do not fall into that category. The fax and duplicate statement charges relate to special services outside of the scope of the basic services provided by a mortgage servicer such as Mellon. There are a number of special services that a borrower could ask Mellon to provide that are not mentioned in the loan documents but which it appears clear that Mellon would have a right to request payment for providing. Included among those would be courier or Federal Express charges (the plaintiff's Settlement Statement with Equity One for refinancing the loan did include such specific Federal Express and courier fees), fees for requests for certified copies of documents, duplicate payment coupon books, amortization tables or other loan information.

It would be difficult for form notes and mortgages that cover long time periods to anticipate and include each and every such incidental special request made by a borrower. Here the plaintiff was asking for faxed payoff statements in order to receive refinancing and take advantage of lower interest rates. To say that a borrower can make such requests for his or her own benefit, yet,

under a principle such as *contra proferentum,* never allow the mortgage servicer to charge for the services unless they are specified in the loan documents would be an unreasonable interpretation of the contracts.

Mellon provides certain basic services to the borrower free of charge, including up to four payoff statements a year, sent by U.S. mail. Because the plaintiff could have discharged the mortgage through the use of this free service, but for convenience chose to have payoff statements faxed, it is not forbidden by the language of the Note and Mortgage to charge a fee for the extra services.[7]

### B. *Release Charges Under ¶ 22 of the Mortgage*

■ Cappellini additionally contends that Paragraph 22 of the Mortgage was violated by Mellon's representations, in the payoff statement and over the phone, that payment of the fees was required to pay off the loan. Paragraph 22 of the Mortgage states that "[u]pon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument without charge to Borrower. Borrower shall pay recordation costs." This discharge provision raises an issue that is distinct from the question of prepayment penalties. The broader meaning of "charge" in ¶ 22 is indicated by the second sentence of the paragraph which specifically includes "recordation costs" as one charge that may be assigned to the borrower before the mortgage and note are released. Therefore it would appear, although I do not find because the facts before me are not fully resolved, that if the lender were to refuse to release the Mortgage and Note for failure of the borrower to pay certain servicing fees, this would violate ¶ 22 of the Mortgage.

The issue presented on this question is a subtle and difficult one the answer to which would require factual development. Cappel-

lini paid the service fees and as a result Mellon released the Mortgage. The circumstances surrounding this transaction, however, raise the question whether Mellon's actions and policies render Cappellini's payment of the fees involuntary and consequently whether the service fees were prohibited by ¶ 22 of the Mortgage. In this case, Cappellini states that he did not learn of the fees until he received the payoff statement and at that time he called Mellon to question the charges. He also explained to a Mellon representative that he was in the process of refinancing. Cappellini contends that the customer service representative from Mellon simply told him that it was Mellon's policy to charge these fees.

Mellon claims, through its payoff manager Carolyn Frazier, that it does not condition the release of a mortgage on the payment of service fees, but instead will release the Mortgage if the borrower merely pays the payoff amount minus the fees.[8] The record does not establish whether this information was relayed to Cappellini when he called Mellon questioning the fees, and there was no indication on the payoff statement that the fees could be separated from the payoff amount for payment purposes. In addition, Mr. Paolino, the closing attorney for the new lender, stated that even if a borrower, like Cappellini, were to request that the new lender simply send the payoff amount minus the payoff fees, he could not send less than the amount on the payoff statement.

Therefore, the critical question presented is whether Cappellini paid the service fees voluntarily or whether they were the result of compulsion by or concealment of the purported Mellon policies in conjunction with the refinancing of the Mortgage. If these charges were paid involuntarily by Cappellini, then they could violate ¶ 22 of the Mort-

---

7. If Mellon did not provide for payoff statements to be mailed free of charge, plaintiff could have argued that this practice barred him from paying off the Mellon Note without incurring fees because a written payoff statement was required by the refinancing lender and could not be obtained without paying a fee. That, however, is a different question which might lead to a different analysis. It is not posed by this case. Here, plaintiff was merely charged for the extra conve-

nience of having the statement faxed to him for immediate review.

8. Frazier stated that Mellon has no written or unwritten policy dealing with situations where borrowers do not pay these fax and statement fees. She did, however, testify that in all circumstances she knew of, Mellon had waived these fees or had not sought to collect them if they were not paid or if a borrower complained.

gage, because ¶ 22 would appear to protect a borrower against a lender using the release of the mortgage as leverage for payment of other fees or charges. A finding of involuntariness requires a showing that Cappellini's payments were made as result of "fraud, concealment or compulsion and with[out] full knowledge of the facts." *Huard v. Forest Street Housing, Inc.,* 366 Mass. 203, 208, 316 N.E.2d 505 (1974); *see also Murphy v. Brilliant Co.,* 323 Mass. 526, 529, 83 N.E.2d 166 (1948); *Carey v. Fitzpatrick,* 301 Mass. 525, 527, 17 N.E.2d 882 (1938). This can be shown where the plaintiff is "obliged to submit to the defendants' demands for payment or forgo benefits to which [he] was entitled." *Johnson v. Brockton,* 8 Mass.App.Ct. 80, 83, 391 N.E.2d 940 (1979).

With respect to the involuntariness issue presented by ¶ 22 of the Mortgage, neither party satisfied its burden of showing a lack of a genuine dispute as to material facts. Hence, I could not say as a matter of law whether the payment of fees at issue here by Cappellini was voluntary or not [9] and thus whether ¶ 22 of the Mortgage was violated with respect to the individual plaintiff's refinancing.

### V. CONCLUSION

For the reasons set out more fully above, plaintiff's motion for partial summary judgment was DENIED, and defendant's motion for summary judgment was GRANTED IN PART, to the extent that the fees at issue in this case were determined not to be improper on their face, and DENIED IN PART, to the extent that the propriety of the imposition of the fees as applied to the individual named plaintiff could not be determined on this record.

█ The case having been reduced to a dispute involving an individual claim having an amount in controversy of $40, continued federal jurisdiction was untenable.

The dispute concerned a single transaction. The predicate for federal question jurisdic-

tion, the RICO statute, requires a demonstration of a "pattern", 18 U.S.C. § 1962, which the single transaction, involving the Cappellinis, even if proven to constitute two acts of "racketeering activity," plainly did not establish. *Schultz v. Rhode Island Hosp. Trust Nat'l Bank,* 94 F.3d 721, 731 (1st Cir. 1996) ("single episode" even when involving multiple related acts does not constitute a "pattern") (citing *Apparel Art Int'l, Inc. v. Jacobson,* 967 F.2d 720, 723 (1st Cir.1992)); *see also, Fleet Credit Corp. v. Sion,* 893 F.2d 441, 444 (1st Cir.1990) (alleging two or more predicate acts is necessary but not sufficient to establish a "pattern"). Nor could a collection of similar claims, even if they could be organized under a manageable class—whatever its aggregate, see note 3, *supra,*—meet the diversity jurisdiction amount in controversy because separately the claims were inadequate. *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). As a matter of practice, I decline to exercise supplemental jurisdiction over cases which demonstrably fail at the outset to pass the threshold of a federal interest. Accordingly, there being no opposition by plaintiff, I directed the clerk to enter a dismissal of this case without prejudice to pursuit of the claims in some other forum of competent jurisdiction.

---

9. Thus, on the state of the record before me, this case is distinguishable from *Westfall* where summary judgment was entered on a record in which "plaintiffs admitted that they never questioned defendants about these fees before the closing, or

after the closing. Their assertions that there was fraud and coercion by defendants are conclusory and unsubstantiated, and fail to raise a triable issue of fact." *Westfall v. Chase Lincoln First Bank, N.A.,* slip op. at 5.